FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH FREDERICK,
             *Plaintiff-Appellant,*

             v.

DEBORAH MORSE; JUNEAU SCHOOL
BOARD,
             *Defendants-Appellees.*

No. 03-35701

D.C. No.
CV-02-00008-J-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
July 8, 2004—Anchorage, Alaska

Filed March 10, 2006

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Kleinfeld

---

## SUMMARY

---

### Constitutional Rights/Freedom of Speech

The court of appeals vacated a judgment of the district court and remanded. The court held that a school may not, in the absence of concern about disruption of educational activities, punish and censor non-disruptive, off-campus speech by students during school-authorized activities because the

2461

speech promotes a social message contrary to the one favored by the school.

While a senior at a high school in Alaska, appellant Joseph Frederick and other students displayed a banner reading "Bong Hits 4 Jesus" across the street from the school during an Olympics torch relay. Frederick said that the words were just nonsense meant to attract television cameras because they were funny. The school principal, appellee Deborah Morse, crossed the street, grabbed and crumpled up the banner, and suspended Frederick for 10 days. While some students engaged in disorderly conduct during the relay, during which students were released from school, Frederick and the other students who displayed the sign did not participate in any of the disorderly conduct. After appealing unsuccessfully through all levels of available administrative and school board review, Frederick sued in district court under 42 U.S.C. § 1983 for a declaratory judgment that his First Amendment rights had been violated, an injunction to remove the reference to the 10 day suspension from his school records, damages, and other relief. Morse and the school board did not claim that the display disrupted or was expected to disrupt any classroom work, and conceded that their objection to the display, and the reason why Morse ripped down the banner, was not concern that it would cause disruption but that its message would be understood as advocating or promoting illegal drug use. The district court granted summary judgment for Morse and the school board, on the grounds that no constitutional rights were violated and Morse and the school board had qualified immunity even if they were.

Frederick appealed.

[1] The Supreme Court has held that the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible. [2] A school cannot censor or punish students

speech merely because the students advocate a position contrary to government policy. [3] What schools are entitled to do is suppress speech that disrupts the good order necessary to conduct their educational function. No educational function was disrupted by the banner displayed during the Olympics event.

[4] The Ninth Circuit has held that school officials have broader authority where they act not to punish but to avert perceived potential harm. [5] Other circuits have similarly held that student speech that is neither plainly offensive nor school-sponsored can be prohibited only where the school district demonstrated a risk of substantial disruption. [6] To censor or punish student speech, the school must show a reasonable concern about the likelihood of substantial disruption to its educational mission. The school conceded that the speech in Frederick's case was censored only because it conflicted with the school's "mission" of discouraging drug use. That reason failed to meet the bar. [7] The school's conduct violated Frederick's First Amendment rights.

[8] To determine whether qualified immunity applied, first, it had to be determined whether the facts alleged showed Morse's conduct violated a constitutional right, whether the right was clearly established at the time of the alleged violation, and whether it would be clear to a reasonable principal that her conduct was unlawful in the situation she confronted. [9] Morse's conduct did violate a constitutional right, as the court of appeals determined. [10] Students retain First Amendment expression rights at school unless authorities reasonably forecast substantial disruption of or material interference with school activities, which no one contended in Frederick's case. For purposes of the second prong of the qualified immunity test, Frederick's right was clearly established. [11] Morse could not have reasonably but mistakenly believed that her conduct did not violate a clearly established constitutional right. The law was so clear and well-settled that no reasonable government official could have believed the

censorship and punishment of Frederick's speech to be lawful. Morse failed the third prong of the test. **[12]** It had to be held that Morse was not entitled to qualified immunity. The judgment of the district court had to be vacated and the case had to be remanded.

## COUNSEL

Douglas K. Mertz, Law Office of Douglas K. Mertz, Juneau, Alaska, for the appellant.

David C. Crosby, P.C., Juneau, Alaska, for the appellees.

Sonja R. West (briefed), Davis, Wright, Tremaine, LLP, Los Angeles, California, for *amici curiae* Student Press Law Center, et al.

John M. Sedor (briefed), Bankston, Gronning, O'Hara, Sedor, Mills, Givens & Heapley, P.C., Anchorage, Alaska, for *amici curiae* Association of Alaska School Boards, et al.

Judith K. Appel (briefed), Drug Policy Alliance, Oakland, California, for *amicus curiae* Drug Alliance Policy.

## OPINION

KLEINFELD, Circuit Judge:

This is a First Amendment student speech case.

### Facts

One January day, Coca-Cola and other private sponsors supported a "Winter Olympics Torch Relay" in Juneau, Alaska. Students were released from school so that they could

watch the Olympic torch pass by. Joseph Frederick, then an 18-year-old senior at Juneau-Douglas High School, never made it to school that morning because he got stuck in the snow in his driveway, but he made it to the sidewalk, across from the school, where the torch would pass by. He and some friends waited until the television cameras would catch it, then unfurled a banner reading "Bong Hits 4 Jesus." Deborah Morse, the school principal, crossed the street, grabbed and crumpled up the banner, and suspended Frederick for ten days. He appealed the suspension administratively, but it was sustained. He then filed a 42 U.S.C. § 1983 action in the Federal District Court seeking declaratory and other relief.

There was disorder at the torch passing, but the uncontradicted evidence is that it had nothing to do with Frederick and his fellow sign-holders. Coca-Cola handed out samples in plastic bottles, and students threw them at each other. Students threw snowballs. Some students got into fights. But Frederick and his group did not participate in these disorders, saving their energy for what they hoped would be their nationally televised sign display. And, the disruption that took place occurred before the display of the banner, so it could not have been caused by it.

In subsequent days, there was some pro-drug graffiti in the high school which the principal thought was "sparked" by the banner, but the principal did not rip down the sign at the rally because she anticipated or was concerned about such possible consequences. When Principal Morse crossed the street from the school and confronted Frederick about the banner, he asked "What about the Bill of Rights and freedom of speech?" She told him to take the banner down because she "felt that it violated the policy against displaying offensive material, including material that advertises or promotes use of illegal drugs," and she grabbed it from him and crumpled it up.

In their answers to interrogatories, Appellees never contend that the display of the banner disrupted or was expected to

disrupt classroom work. Asked for all the ways in which the banner display disrupted the educational process, they said:

> Display of the banner would be construed by many, including students, district personnel, parents and others witnessing the display of the banner, as advocating or promoting illegal drug use which is inconsistent with the district's basic educational mission to promote a healthy, drug-free life style. Failure to react to the display would appear to give the district's imprimatur to that message and would be inconsistent with the district's responsibility to teach students the boundaries of socially appropriate behavior.

There are some genuine disputes about the facts, but they are not material to the resolution of this case. Frederick says that the principal initially told him that he was suspended for five days, but when he quoted Thomas Jefferson to her, she doubled it. The principal says that she does not remember whether he quoted Jefferson to her, but that was not why the suspension was ten days. Frederick says that an assistant principal told him that the Bill of Rights does not exist in schools and does not apply until after graduation, but Principal Morse says that the assistant principal "made some remark to the effect that students do not have the same first amendment rights as adults." Frederick says that students were simply released from school so that they could watch the privately sponsored Olympic Torch being carried through a public street, and a student affidavit he submitted pointed out that the students did not have to obtain parental permission slips to be released, as is the routine for field trips and other supervised events off of the school premises. Principal Morse says that the release was "an approved social event or class trip," noting that the pep band played as the torch passed the school, the cheerleaders were out in uniform to greet the torchbearers, and teachers supervised.

Frederick says (without contradiction) that he had not gone to school that day prior to the banner display, that the banner display was off school property across Glacier Avenue from the campus, and that there were a lot of people, students and non-students, there to watch the torch pass. Other students filed affidavits saying that they were just released, not required to stay together or with their teachers, except for the gym class, and school administrators did not attempt to stop students who got bored and left. Frederick says that the "Bong Hits 4 Jesus" language was designed to be meaningless and funny, in order to get on television, but Principal Morse says that "bong hits" means puffs of marijuana and the words promote marijuana use.

Frederick was suspended for ten days, and appealed unsuccessfully through all levels of available administrative and school board review. He sued under 42 U.S.C. § 1983 for a declaratory judgment that his First Amendment rights had been violated, an injunction to remove the reference to the ten day suspension from his school records, damages, and other relief. The district court granted summary judgment for the Appellees, on the grounds that no constitutional rights were violated and the Appellees had qualified immunity even if they were. Frederick appeals.

## Analysis

We review a grant of summary judgment de novo.[1] The district court reasoned that *Bethel School District No. 403 v. Fraser*,[2] as opposed to *Tinker v. Des Moines Independent Community School District*,[3] governed Frederick's speech. We disagree.

---

[1] *Holley v. Crank*, 400 F.3d 667, 672 (9th Cir. 2005).

[2] *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (holding that the school district permissibly sanctioned a student for his sexually explicit speech at a school assembly).

[3] *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514 (1969) (holding that students retain First Amendment expression rights at school, which may be suppressed only if authorities reasonably "forecast substantial disruption of or material interference with school activities").

One amicus, Drug Policy Alliance, argues that we should analyze this not as a student speech case, but simply as speech on a public sidewalk. That would make the case analogous to a student having an after-school job at a video store that rents out Cheech and Chong tapes, or a student driving a car on public streets with a "Bong Hits 4 Jesus" bumper sticker. Were this factually such a case, the law would be easy indeed, but the facts established by the submissions on summary judgment make this a student speech case. Even though Frederick never got to school that morning, that was only because he got stuck in his driveway because of the snow. School had started and the students were released to watch the Olympic torch pass. And even though supervision of most students was minimal or nonexistent, the school could have supervised them more if it chose to, as it did with the gym class and perhaps the pep band and cheerleaders. Frederick was a student, and school was in session.

There is no genuine issue of fact material to the decision. Frederick's display was not in a class. Frederick and the other students who displayed the sign did not participate in any of the disorderly conduct of the students who threw snowballs or plastic Coca-Cola miniature sample bottles. The school principal and school board do not claim that the display disrupted or was expected to disrupt any classroom work. They concede that their objection to the display, and the reason why the principal ripped down the banner, was not concern that it would cause disruption but that its message would be understood as advocating or promoting illegal drug use.[4] Frederick

---

[4] The issue of "illegal" drug use is a little complicated under Alaska law. Alaska has an express constitutional right to privacy that the federal constitution does not have. The Alaska Supreme Court has held unanimously that the state had the burden of justifying its statute prohibiting marijuana use, and "no adequate justification for the state's intrusion into the citizen's right to privacy by its prohibition of possession of marijuana by an adult for personal consumption in the home has been shown." *Ravin v. State*, 537 P.2d 494, 511 (Alaska 1975), followed in *Noy v. State*, 83 P.3d

says that the words were just nonsense meant to attract television cameras because they were funny. We nevertheless proceed on the basis that the banner expressed a positive sentiment about marijuana use, however vague and nonsensical.

Thus, the question comes down to whether a school may, in the absence of concern about disruption of educational activities, punish and censor non-disruptive, off-campus speech by students during school-authorized activities because the speech promotes a social message contrary to the one favored by the school. The answer under controlling, long-existing precedent is plainly "No."

Because this is a section 1983 case in which the Appellees asserted qualified immunity, we are required to proceed in accord with *Saucier v. Katz*[5] and determine first whether Frederick's constitutional rights were violated. This is an "as applied" challenge, not a "facial" challenge. Frederick argues that his rights were violated as the regulations were applied to him.[6] Under *Tinker v. Des Moines Independent Community School District*,[7] they plainly were.

---

545 (Alaska Ct. App. 2003). Frederick was an adult citizen of Alaska, not a minor, at the time he displayed the sign. The Alaska Supreme Court has also taken a libertarian position regarding schoolchildren, holding that no "compelling state interest" justified a school regulation on boys' hair length. *Breeze v. Smith*, 501 P.2d 159 (Alaska 1972). Alaska has had repeated referenda about whether, and to what extent, to criminalize or legalize marijuana, *see Noy*, 83 P.3d at 545-46, so messages about marijuana have a degree of political salience to them and might be understood as political advocacy. We need not reach any questions of Alaska law.

[5] *Saucier v. Katz*, 533 U.S. 194 (2001).

[6] *See Vlasak v. Superior Court of Cal. ex rel. County of Los Angeles*, 329 F.3d 683, 688 (9th Cir. 2003).

[7] *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).

2470                    FREDERICK v. MORSE

[1] In *Tinker*, the Supreme Court held that wearing black arm bands in high school, "unaccompanied by any disorder or disturbance on the part of [the arm-band wearers]," and unaccompanied by "interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone," was constitutionally protected speech.[8] *Tinker* held that "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible."[9]

[2] *Tinker* disposes of the School Board's argument that "school administrators were entitled to discipline Frederick's attempt to belittle and undercut this critical mission" of preventing use of illegal drugs by a sign that was "a parody of the seriousness with which the school takes its mission to prevent use of illegal drugs." Under *Tinker*, a school cannot censor or punish students speech merely because the students advocate a position contrary to government policy. The *Tinker* armbands were about war. Government has no mission in which victory is so important as war. The federal government was, at the time of the facts giving rise to the *Tinker* case, prosecuting a war. Government policy was to support and advance the effort to win the war. The black armbands in *Tinker* expressed hostility to the war. By doing so, they legitimized opposition and undermined support for the war. Yet the students in high school had a constitutional right to express their opposition to this critically important mission of the federal government.

The two leading Supreme Court cases that have held against students claiming First Amendment rights to speak in a way unacceptable to school administrators are distinguishable. *Bethel School District No. 403 v. Fraser*[10] held that a

---

[8] *Id.* at 508.

[9] *Id.* at 511.

[10] *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).

high school student did not have a First Amendment right to give a sexually suggestive nominating speech for a candidate for student office at a school assembly that "was part of a school-sponsored educational program in self-government," where disruption immediately ensued as the student gave the speech.[11] *Fraser* holds that high school student's rights to free speech in school are not coextensive with adults's rights, and "pervasive sexual innuendo" that is "plainly offensive . . . to any mature person" can be marked off as impermissible incivility within the school context.[12] *Fraser* focuses upon the sexual nature of the offensiveness in the in-school speech that can be punished, as contrasted with the "political viewpoint" of the speech protected in *Tinker*.[13] Our case differs from *Fraser* in that Frederick's speech was not sexual (sexual speech can be expected to stimulate disorder among those new to adult hormones), and did not disrupt a school assembly. Also, it is not so easy to distinguish speech about marijuana from political speech in the context of a state where referenda regarding marijuana legalization repeatedly occur and a controversial state court decision on the topic had recently issued.[14] The phrase "Bong Hits 4 Jesus" may be funny, stupid, or insulting, depending on one's point of view, but it is not "plainly offensive" in the way sexual innuendo is.

*Hazelwood School District v. Kuhlmeier*[15] is similarly distinguishable. In *Kuhlmeier*, the Supreme Court held that high-school students did not have a First Amendment right to publish articles on pregnancy and divorce in a school newspaper over the principal's objection, where the newspaper was produced in a class on journalism, edited by the journalism teacher as part of the teaching of the class, and paid for with

---

[11] *Id.* at 677-78.

[12] *Id.* at 683.

[13] *Id.* at 685.

[14] *See Noy v. State*, 83 P.3d 545 (Alaska Ct. App. 2003).

[15] *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988).

2472                                        FREDERICK v. MORSE

school money.[16] The Court distinguished *Tinker* on the ground that "[t]he question whether the First Amendment requires a school to tolerate particular student speech — the question that we addressed in *Tinker* — is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech."[17] This student newspaper was "part of the school curriculum."[18] Exclusion of any First Amendment duty to "promote" a student viewpoint means that a school necessarily retains authority to refuse to "sponsor" speech such as Frederick's, which arguably promotes drug use.[19] *Kuhlmeier* does not control the case at bar, however, because Frederick's pro-drug banner was not sponsored or endorsed by the school, nor was it part of the curriculum, nor did it take place as part of an official school activity. *Kuhlmeier* might apply had Frederick insisted on making his "Bong Hits 4 Jesus" banner in art class, but that is not what the record shows. His display took place out of school while students were released so that they could watch a Coca-Cola and Olympics activity.

Leaving *Kuhlmeier* out of the analysis, because no sponsorship or curricular activity was involved, the question is how far *Tinker* goes to protect such student speech as Frederick's, and how far *Fraser* goes to protect school authority to censor and punish student speech that "would undermine the school's basic educational mission."[20] There has to be some limit on the school's authority to define its mission in order to keep *Fraser* consistent with the bedrock principle of *Tinker* that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[21] Had the

---

[16] *Id.* at 268-73.
[17] *Id.* at 270-71.
[18] *Id.* at 271.
[19] *Id.* at 272.
[20] *Fraser*, 478 U.S. at 685.
[21] *Tinker*, 393 U.S. at 506.

school in that case defined its mission as instilling patriotic duty or promoting support for national objectives, it still could not have punished the students for wearing the black armbands. All sorts of missions are undermined by legitimate and protected speech — a school's anti-gun mission would be undermined by a student passing around copies of John R. Lott's book, *More Guns, Less Crime*;[22] a school's anti-alcohol mission would be undermined by a student e-mailing links to a medical study showing less heart disease among moderate drinkers than teetotalers; and a school's traffic safety mission would be undermined by a student circulating copies of articles showing that traffic cameras and automatic ticketing systems for cars that run red lights increase accidents.[23]

[3] Public schools are instrumentalities of government, and government is not entitled to suppress speech that undermines whatever missions it defines for itself. What schools are entitled to do, as *Fraser* makes clear, is suppress speech that disrupts the good order necessary to conduct their educational function. No educational function was disrupted by the banner displayed during the Coca-Cola sponsored Olympics event. One can hypothesize off-campus events for which the students might be released that would be educational and curricular in nature and would be disrupted by speech such as Frederick's. For example, on a school field trip as part of the social studies curriculum to observe a court in session, it might be the case that the school could ban the wearing of Cohen's famous jacket.[24] But a Coca Cola promotion as the Olympic torch passed by on a public street was not such an event.

---

[22] John R. Lott, Jr., *More Guns, Less Crime* (1998).

[23] *See, e.g.*, Virginia Transportation Research Council, *An Evaluation of Red Light Camera (Photo-Red) Enforcement in Virginia* (2005), http://virginiadot.org/vtrc/main/online_reports/05-r21.htm.

[24] *Cf. Cohen v. California*, 403 U.S. 15 (1971).

We have no Ninth Circuit authority precisely on point, but what we do have is consistent with the above analysis. In *Burch v. Barker,*[25] we held that a school could not require prior approval for a student newspaper produced outside the school before it was distributed on school grounds to students, distinguishing *Kuhlmeier* because "no one could associate [the newspaper] with school sponsorship or endorsement."[26] *Burch* sorts the cases by the "distinction between school-sponsored as opposed to non-school-sponsored expression."[27] The school board and administrators properly control "what is taught," but "no similar content control is justified for communication among students which is not part of the educational program."[28] We held that the school should be enjoined to "purge the plaintiff-students' records of reprimands for violating the policy" of the school,[29] no doubt the source of Frederick's prayer for similar relief in this case.

We again upheld student speech rights in *Chandler v. McMinnville School District.*[30] When replacements were used during a teachers's strike, some students wore buttons calling the replacement teachers "scabs," and were suspended for refusing to take them off. Reversing the district court's dismissal of the student's complaint, we sorted the high school student speech cases in the following manner:

We have discerned three distinct areas of student speech from the Supreme Court's school precedents: (1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored speech, and (3) speech that falls into neither of these categories. We con-

---

[25]*Burch v. Barker,* 861 F.2d 1149 (9th Cir. 1988). F

[26]*Id.* at 1150.

[27]*Id.* at 1157.

[28]*Id.*

[29]*Id.* at 1159.

[30]*Chandler v. McMinnville School District,* 978 F.2d 524 (9th Cir. 1992).

clude, as discussed below, that the standard for reviewing the suppression of vulgar, lewd, obscene, and plainly offensive speech is governed by *Fraser*, school-sponsored speech by [*Kuhlmeier*], and all other speech by *Tinker*.[31]

[4] Frederick's "Bong Hits 4 Jesus" falls into the third category — the speech controlled by *Tinker*. School officials have broader authority, we held in *LaVine v. Blaine School District*, where they act "not to punish . . . but to avert perceived potential harm."[32] But in Frederick's case, the school officials concede that they acted to punish speech inconsistent with the school's mission, not to avoid potential harm such as the feared school shooting in *LaVine*.

[5] Our sister circuits have similarly held that student speech that is neither plainly offensive nor school-sponsored can be prohibited only where the school district demonstrated a risk of substantial disruption. For example, in *Newsom v. Albemarle County School Board*,[33] the Fourth Circuit addressed a school's ban on clothing depicting, among other images, weapons. Newsom had previously been required by an assistant principal to change out of a National Rifle Association T-shirt depicting "men shooting guns," and sought a preliminary injunction to prevent enforcement of the dress code.[34] As in Frederick's case, the school relied on the fact that the T-shirt conflicted with a "message" it was trying to impart, namely that "Guns and Schools Don't Mix."[35] The Fourth Circuit straightforwardly applied *Tinker*, distinguished *Fraser* and *Kuhlmeier*, and concluded that, because there was no evidence that clothes showing or mentioning weapons had

[31] *Id.* at 529 (citations omitted).

[32] *LaVine v. Blaine School District*, 257 F.3d 981, 983 (9th Cir. 2001).

[33] *Newsom v. Albemarle County School Board*, 354 F.3d 249 (4th Cir. 2003).

[34] *Id.* at 253-54.

[35] *Id.* at 252.

ever substantially disrupted school operations, the school could not ban this expressive display of speech without impinging on the student's First Amendment rights.[36] The court wryly noted that the school's rigid dress code would prohibit a student from wearing a T-shirt depicting the insignia of a military unit in which a sibling might be serving, or even the official state seal.[37]

Likewise, in *Scott* v. *School Board of Alachua County*,[38] the Eleventh Circuit upheld suspensions imposed on students for displaying the confederate flag on school premises; where the school board's ban on confederate symbols was premised on the history of racial tension and fights at the school.[39] The Third, Sixth, and Tenth Circuits have similarly applied *Tinker*'s requirement that the speech or symbols to be censored must pose a legitimate likelihood of disruption.[40]

In support of their argument that disciplining Frederick was appropriate, Appellees point to *Boroff* v. *Van Wert City Board of Education*,[41] a Sixth Circuit case which upheld a high

---

[36] *Id.* at 260.

[37] *Id.*

[38] *Scott* v. *School Board of Alachua County*, 324 F.3d 1246 (11th Cir. 2003).

[39] *Id.* at 1249.

[40] *West* v. *Derby Young Unified School Dist. No. 260*, 206 F.3d 1358, 1366-67 (10th Cir. 2000) (upholding ban on confederate imagery, given past racial tensions and confrontations); *Melton* v. *Young*, 465 F.2d 1332, 1334-35 (6th Cir. 1972) (same); *see also Sypniewski* v. *Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 257 (3rd Cir. 2002) (finding, for the purposes of preliminary injunction, inadequate support for school board's position that T-shirts bearing the term "redneck" posed a "well-founded fear of genuine disruption"); *Castorina ex rel. Rewt* v. *Madison County Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001) (remanding for factual determination whether there had been racial incidents related to confederate flags).

[41] *Boroff* v. *Van Wert City Board of Education*, 220 F.3d 465 (6th Cir. 2000).

school dress code that was applied to prohibit the wearing of Marilyn Manson T-shirts. The T-shirts contained pro-drug and anti-religious messages and imagery.[42] In *Boroff*, the Sixth Circuit interpreted *Fraser* to grant the school wide-ranging discretion to determine the appropriateness or inappropriateness of certain messages at school. The court concluded that clothing may be banned when it contains "symbols and words that promote values that are [] patently contrary to the school's educational mission."[43] We need not pass on whether the clothing ban in *Boroff* could be upheld under our precedent. Nonetheless, to the degree *Boroff* implies that student speech may be prohibited as "plainly offensive" whenever it conflicts with a vaguely-defined "educational mission," we decline to follow it.[44]

However, even if we were inclined to adopt *Boroff*, this case is distinguishable in one key respect. *Boroff* sought to

---

[42] *Id.* at 469-70.

[43] *Id.* at 470. The school defined its implicated "educational mission" as "to be respectful of others and others' beliefs." *Id.* at 469.

[44] The word "offensive" is not a catch-all to embrace any speech that might offend some hearers. Nor was *Fraser* an invitation to censor and punish any speech that offends school authorities. For example, "scab" is an offensive term, intended to be derogatory, for replacement workers during a strike. Calling replacement teachers "scabs" undermined the school's "mission" to function despite the strike and enable the replacement workers to exercise their authority as teachers and was personally insulting to the replacement teachers. Yet in *McMinnville*, we held that offensiveness in this sense does not take a case from *Tinker* to *Fraser*. By Appellees' standard, distributing photocopies of the Alaska Supreme Court decision in *Ravin v. State*, in which it declared that there is "no adequate justification for the state's intrusion into the citizen's right to privacy by its prohibition of possession of marijuana," 537 P.2d at 511, would also undermine the school's anti-drug mission. However, it could not seriously be contended that handing out copies of *Ravin* on the sidewalk across the street from the school while students were released from classes could be punished. *Fraser* only enables schools to prevent the sort of vulgar, obscene, lewd, or sexual speech that, especially with adolescents, readily promotes disruption and diversion from the *educational curriculum*.

wear his T-shirt in the classroom, where its message would be more likely to interfere with the school's core educational mission. Frederick's banner, by comparison, was displayed outside the classroom, across the street from the school, during a non-curricular activity that was only partially supervised by school officials. It most certainly did not interfere with the school's basic educational mission.[45]

[6] We therefore hold that Frederick's punishment for displaying his banner is best reviewed under *Tinker*, rather than *Fraser* or *Kuhlmeier*. *Tinker* requires that, to censor or punish student speech, the school must show a reasonable concern about the likelihood of substantial disruption to its educational mission. Appellees conceded that the speech in this case was censored only because it conflicted with the school's "mission" of discouraging drug use. That reason fails to meet the bar.

[7] Appellees's conduct violated Frederick's First Amendment rights. Because his speech is protected by the federal constitution, we need not reach the question of whether it is protected by the Alaska Constitution.

[8] We next must address whether, for the purposes of money damages,[46] Appellee Morse is entitled to qualified immunity. The law "provide[s] government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[47] The analysis adopted by

---

[45] "We do not reach the question of whether the school could have prohibited Frederick from displaying his banner on school grounds or wearing a T-shirt that read "Bong Hits 4 Jesus."

[46] Qualified immunity does not apply to suits for declaratory or injunctive relief. *See Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

[47] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted).

the Supreme Court in *Saucier v. Katz* requires that we employ a three-part test to determine whether qualified immunity applies.[48] First, we must determine whether the "facts alleged show [Morse's] conduct violated a constitutional right."[49] Second, we must determine whether the right was clearly established at the time of the alleged violation.[50] Finally, we must determine "whether it would be clear to a reasonable [principal] that [her] conduct was unlawful in the situation [she] confronted."[51]

[9] The first question, whether Morse's conduct violated a constitutional right, has been addressed above in detail and answered in the affirmative. We next must determine whether the violated right was clearly established. This inquiry is a pure question of law.[52] Although for a right to be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable [principal] would understand [that] what [she] is doing violates that right," there is no requirement that we identify a prior identical action.[53] Indeed, even if there were not binding precedent in this case, we would be justified in examining a wide range of relevant legal authority, such as the law of other circuits.[54] As we have already shown, the only times other circuit courts have held that conduct like Morse's is not a constitutional violation, they have done so under facts "distinguishable in a fair way from the facts presented in the case at hand."[55] In this case, however, we need not look so far afield, because there exists clear, well-established law of the Supreme Court and of this circuit that

[48]*Saucier v. Katz,* 533 U.S. 194, 201 (2001).

[49]*Id.*

[50]*Id.*

[51]*Id.* at 202.

[52]*See Trevino v. Gates,* 99 F.3d 911, 917 (9th Cir. 1996).

[53]*Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[54]*See Elder v. Holloway,* 510 U.S. 510, 512, 516 (1994).

[55]*Saucier,* 533 U.S. at 202.

2480                 FREDERICK v. MORSE

governs the panoply of student speech cases that might face a school principal: the law of *Tinker, Fraser, Kuhlmeier, Burch,* and *McMinnville.*

[10] As we explicitly discussed in *McMinnville,* and also noted *supra*: vulgar, lewd, and obscene speech is governed by *Fraser,* school-sponsored speech is governed by *Kuhlmeier,* and all other student speech is governed by *Tinker.*[56] Under *Tinker,* students retain First Amendment expression rights at school unless authorities reasonably "forecast substantial disruption of or material interference with school activities," which no one contends in this case.[57] Furthermore, Morse readily admits to being aware of the relevant law, indicating that in her "advanced school law" course she studied *"Tinker,* [*Kuhlmeier*], *Bethel, Fraser,* all of the pertinent case law related to student rights or . . . related to schools." The law of which Morse was aware clearly established Frederick's constitutional free speech right. In addition, in *McMinnville* we succinctly explained how to apply the various Supreme Court doctrines of which Morse was aware, thus ensuring that opacity in this particular corner of the law has been all but banished.[58] For purposes of the second prong of the *Saucier* qualified immunity test, Frederick's right was clearly established.

[11] The only remaining inquiry, therefore, requires that we determine whether Morse "could . . . have reasonably but mistakenly believed that [ ] her conduct did not violate a clearly established constitutional right."[59] We conclude that she could not have. Once we have held that "the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing [the official's] conduct."[60] And indeed, even lack of

[56] *McMinnville,* 978 F.2d at 529.

[57] *Tinker,* 393 U.S. at 514.

[58] *McMinnville,* 978 F.2d at 529.

[59] *Saucier,* 533 U.S. at 205.

[60] *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19 (1982).

FREDERICK V. MORSE    2481

knowledge of the basic constitutional rights would not provide a basis for immunity.[61] This is no case of ignorance. The law was clear, and Morse was aware of it. The law of this circuit has provided explicit directives such that officials may determine which Supreme Court standards govern which types of potential student behavior. No novel question is posed on the basis urged by defendants—that "Bong Hits 4 Jesus" promoted a view contrary to government policy—because the armbands in Tinker raised the same concerns. The law of Tinker, Fraser, Kuhlmeier, Burch, and McMinnville is so clear and well-settled that no reasonable government official could have believed the censorship and punishment of Frederick's speech to be lawful.[62] In fact, there is nothing in the authorities that justifies what the school did, and no reasonable official could conclude otherwise. Morse fails the third prong of the Saucier test.

[12] Thus, having determined that the "facts alleged show [Morse's] conduct violated a constitutional right," that "the right was clearly established," and that "it would be clear to a reasonable [principal] that [her] conduct was unlawful in the situation [she] confronted," we hold that defendant Morse is not entitled to qualified immunity.[63]

The judgment of the district court is VACATED and the case is REMANDED.

[61] See Wood v. Strickland, 420 U.S. 308, 321-22 (1975).
[62] See Vance v. Barrett, 345 F.3d 1083, 1094 (9th Cir. 2003).
[63] Saucier, 533 U.S. at 201-02.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO
© 2006 Thomson/West.

The summary, which does not constitute a part of the opinion of the court, is copyrighted