OCTOBER TERM, 2006    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MORSE ET AL. *v.* FREDERICK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–278.  Argued March 19, 2007—Decided June 25, 2007

At a school-sanctioned and school-supervised event, petitioner Morse, the high school principal, saw students unfurl a banner stating "BONG HiTS 4 JESUS," which she regarded as promoting illegal drug use. Consistent with established school policy prohibiting such messages at school events, Morse directed the students to take down the banner. When one of the students who had brought the banner to the event—respondent Frederick—refused, Morse confiscated the banner and later suspended him. The school superintendent upheld the suspension, explaining, *inter alia*, that Frederick was disciplined because his banner appeared to advocate illegal drug use in violation of school policy. Petitioner school board also upheld the suspension. Frederick filed suit under 42 U. S. C. §1983, alleging that the school board and Morse had violated his First Amendment rights. The District Court granted petitioners summary judgment, ruling that they were entitled to qualified immunity and that they had not infringed Frederick's speech rights. The Ninth Circuit reversed. Accepting that Frederick acted during a school-authorized activity and that the banner expressed a positive sentiment about marijuana use, the court nonetheless found a First Amendment violation because the school punished Frederick without demonstrating that his speech threatened substantial disruption. It also concluded that Morse was not entitled to qualified immunity because Frederick's right to display the banner was so clearly established that a reasonable principal in Morse's position would have understood that her actions were unconstitutional.

*Held:* Because schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use, the school officials in this case did not violate the

2                    MORSE *v.* FREDERICK

Syllabus

First Amendment by confiscating the pro-drug banner and suspending Frederick. Pp. 5–15.

(a) Frederick's argument that this is not a school speech case is rejected. The event in question occurred during normal school hours and was sanctioned by Morse as an approved social event at which the district's student-conduct rules expressly applied. Teachers and administrators were among the students and were charged with supervising them. Frederick stood among other students across the street from the school and directed his banner toward the school, making it plainly visible to most students. Under these circumstances, Frederick cannot claim he was not at school. Pp. 5–6.

(b) The Court agrees with Morse that those who viewed the banner would interpret it as advocating or promoting illegal drug use, in violation of school policy. At least two interpretations of the banner's words—that they constitute an imperative encouraging viewers to smoke marijuana or, alternatively, that they celebrate drug use—demonstrate that the sign promoted such use. This pro-drug interpretation gains further plausibility from the paucity of alternative meanings the banner might bear. Pp. 6–8.

(c) A principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use. In *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, the Court declared, in holding that a policy prohibiting high school students from wearing antiwar armbands violated the First Amendment, *id.,* at 504, that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school," *id.,* at 513. The Court in *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675, however, upheld the suspension of a student who delivered a high school assembly speech employing "an elaborate, graphic, and explicit sexual metaphor," *id.,* at 678. Analyzing the case under *Tinker,* the lower courts had found no disruption, and therefore no basis for discipline. 478 U. S., at 679–680. This Court reversed, holding that the school was "within its permissible authority in imposing sanctions . . . in response to [the student's] offensively lewd and indecent speech." *Id.,* at 685. Two basic principles may be distilled from *Fraser.* First, it demonstrates that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.,* at 682. Had Fraser delivered the same speech in a public forum outside the school context, he would have been protected. See, *id.,* at 682–683. In school, however, his First Amendment rights were circumscribed "in light of the special characteristics of the school environment." *Tinker, supra,* at 506. Second, *Fraser* es-

Cite as: 551 U. S. ____ (2007)            3

Syllabus

tablished that *Tinker*'s mode of analysis is not absolute, since the *Fraser* Court did not conduct the "substantial disruption" analysis. Subsequently, the Court has held in the Fourth Amendment context that "while children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' . . . the nature of those rights is what is appropriate for children in school," *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655–656, and has recognized that deterring drug use by schoolchildren is an "important—indeed, perhaps compelling" interest, *id.*, at 661. Drug abuse by the Nation's youth is a serious problem. For example, Congress has declared that part of a school's job is educating students about the dangers of drug abuse, see, *e.g.*, the Safe and Drug-Free Schools and Communities Act of 1994, and petitioners and many other schools have adopted policies aimed at implementing this message. Student speech celebrating illegal drug use at a school event, in the presence of school administrators and teachers, poses a particular challenge for school officials working to protect those entrusted to their care. The "special characteristics of the school environment," *Tinker,* 393 U. S., at 506, and the governmental interest in stopping student drug abuse allow schools to restrict student expression that they reasonably regard as promoting such abuse. *Id.,* at 508, 509, distinguished. Pp. 8–15.

439 F. 3d 1114, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed a concurring opinion, in which KENNEDY, J., joined. BREYER, J., filed an opinion concurring in the judgment in part and dissenting in part. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined.

Cite as: 551 U. S. ____ (2007)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 06–278

————

## DEBORAH MORSE, ET AL., PETITIONERS v. JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

At a school-sanctioned and school-supervised event, a high school principal saw some of her students unfurl a large banner conveying a message she reasonably regarded as promoting illegal drug use. Consistent with established school policy prohibiting such messages at school events, the principal directed the students to take down the banner. One student—among those who had brought the banner to the event—refused to do so. The principal confiscated the banner and later suspended the student. The Ninth Circuit held that the principal's actions violated the First Amendment, and that the student could sue the principal for damages.

Our cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969). At the same time, we have held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel School*

Opinion of the Court

*Dist. No. 403* v. *Fraser*, 478 U. S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 266 (1988) (quoting *Tinker, supra,* at 506). Consistent with these principles, we hold that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. We conclude that the school officials in this case did not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it.

I

On January 24, 2002, the Olympic Torch Relay passed through Juneau, Alaska, on its way to the winter games in Salt Lake City, Utah. The torchbearers were to proceed along a street in front of Juneau-Douglas High School (JDHS) while school was in session. Petitioner Deborah Morse, the school principal, decided to permit staff and students to participate in the Torch Relay as an approved social event or class trip. App. 22–23. Students were allowed to leave class to observe the relay from either side of the street. Teachers and administrative officials monitored the students' actions.

Respondent Joseph Frederick, a JDHS senior, was late to school that day. When he arrived, he joined his friends (all but one of whom were JDHS students) across the street from the school to watch the event. Not all the students waited patiently. Some became rambunctious, throwing plastic cola bottles and snowballs and scuffling with their classmates. As the torchbearers and camera crews passed by, Frederick and his friends unfurled a 14-foot banner bearing the phrase: "BONG HiTS 4 JESUS." App. to Pet. for Cert. 70a. The large banner was easily readable by the students on the other side of the street.

Principal Morse immediately crossed the street and

Opinion of the Court

demanded that the banner be taken down.  Everyone but
Frederick complied.   Morse confiscated the banner and
told Frederick to report to her office, where she suspended
him for 10 days.   Morse later explained that she told
Frederick to take the banner down because she thought it
encouraged illegal drug use, in violation of established
school policy.  Juneau School Board Policy No. 5520 states:
"The Board specifically prohibits any assembly or public
expression that . . . advocates the use of substances that
are illegal to minors . . . ."  *Id.,* at 53a.  In addition, Juneau
School Board Policy No. 5850 subjects "[p]upils who par-
ticipate in approved social events and class trips" to the
same student conduct rules that apply during the regular
school program.  *Id.,* at 58a.

   Frederick administratively appealed his suspension, but
the Juneau School District Superintendent upheld it,
limiting it to time served (8 days).   In a memorandum
setting forth his reasons, the superintendent determined
that Frederick had displayed his banner "in the midst of
his fellow students, during school hours, at a school-
sanctioned activity."  *Id.,* at 63a.  He further explained
that Frederick "was not disciplined because the principal
of the school 'disagreed' with his message, but because his
speech appeared to advocate the use of illegal drugs."  *Id.,*
at 61a.

   The superintendent continued:

      "The common-sense understanding of the phrase 'bong
      hits' is that it is a reference to a means of smoking
      marijuana.  Given [Frederick's] inability or unwilling-
      ness to express any other credible meaning for the
      phrase, I can only agree with the principal and count-
      less others who saw the banner as advocating the use
      of illegal drugs.  [Frederick's] speech was not political.
      He was not advocating the legalization of marijuana
      or promoting a religious belief.  He was displaying a

Opinion of the Court

> fairly silly message promoting illegal drug usage in
> the midst of a school activity, for the benefit of televi-
> sion cameras covering the Torch Relay. [Frederick's]
> speech was potentially disruptive to the event and
> clearly disruptive of and inconsistent with the school's
> educational mission to educate students about the
> dangers of illegal drugs and to discourage their use."
> *Id.,* at 61a–62a.

Relying on our decision in *Fraser, supra,* the superinten-
dent concluded that the principal's actions were permissi-
ble because Frederick's banner was "speech or action that
intrudes upon the work of the schools." App. to Pet. for
Cert. 62a (internal quotation marks omitted). The Juneau
School District Board of Education upheld the suspension.

Frederick then filed suit under 42 U. S. C. §1983, alleg-
ing that the school board and Morse had violated his First
Amendment rights. He sought declaratory and injunctive
relief, unspecified compensatory damages, punitive dam-
ages, and attorney's fees. The District Court granted
summary judgment for the school board and Morse, ruling
that they were entitled to qualified immunity and that
they had not infringed Frederick's First Amendment
rights. The court found that Morse reasonably interpreted
the banner as promoting illegal drug use—a message that
"directly contravened the Board's policies relating to drug
abuse prevention." App. to Pet. for Cert. 36a–38a. Under
the circumstances, the court held that "Morse had the
authority, if not the obligation, to stop such messages at a
school-sanctioned activity." *Id.,* at 37a.

The Ninth Circuit reversed. Deciding that Frederick
acted during a "school-authorized activit[y]," and "pro-
ceed[ing] on the basis that the banner expressed a positive
sentiment about marijuana use," the court nonetheless
found a violation of Frederick's First Amendment rights
because the school punished Frederick without demon-

Opinion of the Court

strating that his speech gave rise to a "risk of substantial disruption." 439 F. 3d 1114, 1118, 1121–1123 (2006). The court further concluded that Frederick's right to display his banner was so "clearly established" that a reasonable principal in Morse's position would have understood that her actions were unconstitutional, and that Morse was therefore not entitled to qualified immunity. *Id.,* at 1123–1125.

We granted certiorari on two questions: whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages. 549 U. S. ___ (2006). We resolve the first question against Frederick, and therefore have no occasion to reach the second.[1]

## II

At the outset, we reject Frederick's argument that this is not a school speech case—as has every other authority to address the question. See App. 22–23 (Principal Morse); App. to Pet. for Cert. 63a (superintendent); *id.,* at 69a (school board); *id.,* at 34a–35a (District Court); 439 F. 3d, at 1117 (Ninth Circuit). The event occurred during

───────────

[1] JUSTICE BREYER would rest decision on qualified immunity without reaching the underlying First Amendment question. The problem with this approach is the rather significant one that it is inadequate to decide the case before us. Qualified immunity shields public officials from money damages only. See *Wood* v. *Strickland,* 420 U. S. 308, 314, n. 6 (1975). In this case, Frederick asked not just for damages, but also for declaratory and injunctive relief. App. 13. JUSTICE BREYER's proposed decision on qualified immunity grounds would dispose of the damages claims, but Frederick's other claims would remain unaddressed. To get around that problem, JUSTICE BREYER hypothesizes that Frederick's suspension—the target of his request for injunctive relief—"may well be justified on non-speech-related grounds." See *post,* at 9. That hypothesis was never considered by the courts below, never raised by any of the parties, and is belied by the record, which nowhere suggests that the suspension would have been justified solely on non-speech-related grounds.

Opinion of the Court

normal school hours. It was sanctioned by Principal Morse "as an approved social event or class trip," App. 22–23, and the school district's rules expressly provide that pupils in "approved social events and class trips are subject to district rules for student conduct." App. to Pet. for Cert. 58a. Teachers and administrators were interspersed among the students and charged with supervising them. The high school band and cheerleaders performed. Frederick, standing among other JDHS students across the street from the school, directed his banner toward the school, making it plainly visible to most students. Under these circumstances, we agree with the superintendent that Frederick cannot "stand in the midst of his fellow students, during school hours, at a school-sanctioned activity and claim he is not at school." *Id.,* at 63a. There is some uncertainty at the outer boundaries as to when courts should apply school-speech precedents, see *Porter* v. *Ascension Parish School Bd.*, 393 F. 3d 608, 615, n. 22 (CA5 2004), but not on these facts.

### III

The message on Frederick's banner is cryptic. It is no doubt offensive to some, perhaps amusing to others. To still others, it probably means nothing at all. Frederick himself claimed "that the words were just nonsense meant to attract television cameras." 439 F. 3d, at 1117–1118. But Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one.

As Morse later explained in a declaration, when she saw the sign, she thought that "the reference to a 'bong hit' would be widely understood by high school students and others as referring to smoking marijuana." App. 24. She further believed that "display of the banner would be construed by students, District personnel, parents and others witnessing the display of the banner, as advocating

Opinion of the Court

or promoting illegal drug use"—in violation of school policy. *Id.,* at 25; see *ibid.* ("I told Frederick and the other members of his group to put the banner down because I felt that it violated the [school] policy against displaying . . . material that advertises or promotes use of illegal drugs").

We agree with Morse. At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs. First, the phrase could be interpreted as an imperative: "[Take] bong hits . . ."—a message equivalent, as Morse explained in her declaration, to "smoke marijuana" or "use an illegal drug." Alternatively, the phrase could be viewed as celebrating drug use—"bong hits [are a good thing]," or "[we take] bong hits"—and we discern no meaningful distinction between celebrating illegal drug use in the midst of fellow students and outright advocacy or promotion. See *Guiles* v. *Marineau*, 461 F. 3d 320, 328 (CA2 2006) (discussing the present case and describing the sign as "a clearly pro-drug banner").

The pro-drug interpretation of the banner gains further plausibility given the paucity of alternative meanings the banner might bear. The best Frederick can come up with is that the banner is "meaningless and funny." 439 F. 3d, at 1116. The dissent similarly refers to the sign's message as "curious," *post,* at 1, "ambiguous," *ibid.,* "nonsense," *post,* at 2, "ridiculous," *post,* at 6, "obscure," *post,* at 7, "silly," *post,* at 12, "quixotic," *post,* at 13, and "stupid," *ibid.* Gibberish is surely a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores its undeniable reference to illegal drugs.

The dissent mentions Frederick's "credible and uncontradicted explanation for the message—he just wanted to get on television." *Post,* at 12. But that is a description of Frederick's *motive* for displaying the banner; it is not an

interpretation of what the banner says.  The *way* Frederick was going to fulfill his ambition of appearing on television was by unfurling a pro-drug banner at a school event, in the presence of teachers and fellow students.

Elsewhere in its opinion, the dissent emphasizes the importance of political speech and the need to foster "national debate about a serious issue," *post,* at 16, as if to suggest that the banner is political speech.  But not even Frederick argues that the banner conveys any sort of political or religious message.  Contrary to the dissent's suggestion, see *post,* at 14–16, this is plainly not a case about political debate over the criminalization of drug use or possession.

## IV

The question thus becomes whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use.  We hold that she may.

In *Tinker*, this Court made clear that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students."  393 U. S., at 506.  *Tinker* involved a group of high school students who decided to wear black armbands to protest the Vietnam War.  School officials learned of the plan and then adopted a policy prohibiting students from wearing armbands.  When several students nonetheless wore armbands to school, they were suspended.  *Id.,* at 504.  The students sued, claiming that their First Amendment rights had been violated, and this Court agreed.

*Tinker* held that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school."  *Id.,* at 513.  The essential facts of

Opinion of the Court

*Tinker* are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech, using the armbands to express their "disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Id.,* at 514. Political speech, of course, is "at the core of what the First Amendment is designed to protect." *Virginia* v. *Black,* 538 U. S. 343, 365 (2003). The only interest the Court discerned underlying the school's actions was the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," or "an urgent wish to avoid the controversy which might result from the expression." *Tinker,* 393 U. S., at 509, 510. That interest was not enough to justify banning "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.,* at 508.

This Court's next student speech case was *Fraser,* 478 U. S. 675. Matthew Fraser was suspended for delivering a speech before a high school assembly in which he employed what this Court called "an elaborate, graphic, and explicit sexual metaphor." *Id.,* at 678. Analyzing the case under *Tinker,* the District Court and Court of Appeals found no disruption, and therefore no basis for disciplining Fraser. 478 U. S., at 679–680. This Court reversed, holding that the "School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech." *Id.,* at 685.

The mode of analysis employed in *Fraser* is not entirely clear. The Court was plainly attuned to the content of Fraser's speech, citing the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech." *Id.,* at 680. But the Court also reasoned that school boards have the authority to determine "what manner of speech in the classroom or

10                    MORSE *v.* FREDERICK

Opinion of the Court

in school assembly is inappropriate." *Id.,* at 683.  Cf. *id.,*
at 689 (Brennan, J., concurring in judgment) ("In the
present case, school officials sought only to ensure that a
high school assembly proceed in an orderly manner.
There is no suggestion that school officials attempted to
regulate [Fraser's] speech because they disagreed with the
views he sought to express").

We need not resolve this debate to decide this case.  For
present purposes, it is enough to distill from *Fraser* two
basic principles.  First, *Fraser*'s holding demonstrates that
"the constitutional rights of students in public school are
not automatically coextensive with the rights of adults in
other settings."  *Id.,* at 682.  Had Fraser delivered the
same speech in a public forum outside the school context,
it would have been protected.  See *Cohen* v. *California*,
403 U. S. 15 (1971); *Fraser, supra,* at 682–683.  In school,
however, Fraser's First Amendment rights were circum-
scribed "in light of the special characteristics of the school
environment."  *Tinker, supra,* at 506.  Second, *Fraser*
established that the mode of analysis set forth in *Tinker* is
not absolute.  Whatever approach *Fraser* employed, it
certainly did not conduct the "substantial disruption"
analysis prescribed by *Tinker, supra,* at 514.  See *Kuhl-
meier*, 484 U. S., at 271, n. 4 (disagreeing with the proposi-
tion that there is "no difference between the First
Amendment analysis applied in *Tinker* and that applied in
*Fraser,*" and noting that the holding in *Fraser* was not
based on any showing of substantial disruption).

Our most recent student speech case, *Kuhlmeier*, con-
cerned "expressive activities that students, parents, and
members of the public might reasonably perceive to bear
the imprimatur of the school."  484 U. S., at 271.  Staff
members of a high school newspaper sued their school
when it chose not to publish two of their articles.  The
Court of Appeals analyzed the case under *Tinker*, ruling in
favor of the students because it found no evidence of mate-

Opinion of the Court

rial disruption to classwork or school discipline. 795 F. 2d 1368, 1375 (CA8 1986). This Court reversed, holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Kuhlmeier, supra,* at 273.

*Kuhlmeier* does not control this case because no one would reasonably believe that Frederick's banner bore the school's imprimatur. The case is nevertheless instructive because it confirms both principles cited above. *Kuhlmeier* acknowledged that schools may regulate some speech "even though the government could not censor similar speech outside the school." *Id.,* at 266. And, like *Fraser,* it confirms that the rule of *Tinker* is not the only basis for restricting student speech.[2]

Drawing on the principles applied in our student speech cases, we have held in the Fourth Amendment context that "while children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' . . . the nature of those rights is what is appropriate for children in school." *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655–656 (1995) (quoting *Tinker, supra,* at 506). In particular, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 340 (1985). See *Vernonia, supra,* at 656 ("Fourth Amendment rights,

---

[2] The dissent's effort to find inconsistency between our approach here and the opinion in *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, 551 U. S. ___ (2007), see *post,* at 12 (opinion of STEVENS, J.), overlooks what was made clear in *Tinker*, *Fraser*, and *Kuhlmeier*: student First Amendment rights are "applied in light of the special characteristics of the school environment." *Tinker*, 393 U. S., at 506. See *Fraser*, 478 U. S., at 682; *Kuhlmeier*, 484 U. S., at 266. And, as discussed above, *supra,* at 8, there is no serious argument that Frederick's banner is political speech of the sort at issue in *Wisconsin Right to Life*.

no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere . . ."); *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 829-830 (2002) ("'special needs' inhere in the public school context"; "[w]hile schoolchildren do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children" (quoting *Vernonia*, 515 U. S., at 656; citation and some internal quotation marks omitted).

Even more to the point, these cases also recognize that deterring drug use by schoolchildren is an "important—indeed, perhaps compelling" interest. *Id.,* at 661. Drug abuse can cause severe and permanent damage to the health and well-being of young people:

> "School years are the time when the physical, psychological, and addictive effects of drugs are most severe. Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound; children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor. And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted." *Id.,* at 661–662 (citations and internal quotation marks omitted).

Just five years ago, we wrote: "The drug abuse problem among our Nation's youth has hardly abated since *Vernonia* was decided in 1995. In fact, evidence suggests that it has only grown worse." *Earls*, *supra,* at 834, and n. 5.

The problem remains serious today. See generally 1 National Institute on Drug Abuse, National Institutes of

Opinion of the Court

Health, Monitoring the Future: National Survey Results on Drug Use, 1975–2005, Secondary School Students (2006). About half of American 12th graders have used an illicit drug, as have more than a third of 10th graders and about one-fifth of 8th graders. *Id.,* at 99. Nearly one in four 12th graders has used an illicit drug in the past month. *Id.,* at 101. Some 25% of high schoolers say that they have been offered, sold, or given an illegal drug on school property within the past year. Dept. of Health and Human Services, Centers for Disease Control and Prevention, Youth Risk Behavior Surveillance—United States, 2005, 55 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS–5, p. 19 (June 9, 2006).

Congress has declared that part of a school's job is educating students about the dangers of illegal drug use. It has provided billions of dollars to support state and local drug-prevention programs, Brief for United States as *Amicus Curiae* 1, and required that schools receiving federal funds under the Safe and Drug-Free Schools and Communities Act of 1994 certify that their drug prevention programs "convey a clear and consistent message that . . . the illegal use of drugs [is] wrong and harmful." 20 U. S. C. §7114(d)(6) (2000 ed., Supp. IV).

Thousands of school boards throughout the country—including JDHS—have adopted policies aimed at effectuating this message. See Pet. for Cert. 17–21. Those school boards know that peer pressure is perhaps "the single most important factor leading schoolchildren to take drugs," and that students are more likely to use drugs when the norms in school appear to tolerate such behavior. *Earls, supra,* at 840 (BREYER, J., concurring). Student speech celebrating illegal drug use at a school event, in the presence of school administrators and teachers, thus poses a particular challenge for school officials working to protect those entrusted to their care from the dangers of drug abuse.

Opinion of the Court

The "special characteristics of the school environment," *Tinker*, 393 U. S., at 506, and the governmental interest in stopping student drug abuse—reflected in the policies of Congress and myriad school boards, including JDHS— allow schools to restrict student expression that they reasonably regard as promoting illegal drug use. *Tinker* warned that schools may not prohibit student speech because of "undifferentiated fear or apprehension of dis- turbance" or "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.,* at 508, 509. The danger here is far more serious and palpable. The particular concern to prevent student drug abuse at issue here, embodied in established school policy, App. 92–95; App. to Pet. for Cert. 53a, ex- tends well beyond an abstract desire to avoid controversy.

Petitioners urge us to adopt the broader rule that Fre- derick's speech is proscribable because it is plainly "offen- sive" as that term is used in *Fraser.* See Reply Brief for Petitioners 14–15. We think this stretches *Fraser* too far; that case should not be read to encompass any speech that could fit under some definition of "offensive." After all, much political and religious speech might be perceived as offensive to some. The concern here is not that Frederick's speech was offensive, but that it was reasonably viewed as promoting illegal drug use.

Although accusing this decision of doing "serious vio- lence to the First Amendment" by authorizing "viewpoint discrimination," *post,* at 2, 5 (opinion of STEVENS, J.), the dissent concludes that "it might well be appropriate to tolerate some targeted viewpoint discrimination in this unique setting," *post,* at 6–7. Nor do we understand the dissent to take the position that schools are required to tolerate student advocacy of illegal drug use at school events, even if that advocacy falls short of inviting "immi- nent" lawless action. See *post,* at 7 ("[I]t is possible that our rigid imminence requirement ought to be relaxed at

Opinion of the Court

schools"). And even the dissent recognizes that the issues here are close enough that the principal should not be held liable in damages, but should instead enjoy qualified immunity for her actions. See *post,* at 1. Stripped of rhetorical flourishes, then, the debate between the dissent and this opinion is less about constitutional first principles than about whether Frederick's banner constitutes promotion of illegal drug use. We have explained our view that it does. The dissent's contrary view on that relatively narrow question hardly justifies sounding the First Amendment bugle.

\*    \*    \*

School principals have a difficult job, and a vitally important one. When Frederick suddenly and unexpectedly unfurled his banner, Morse had to decide to act—or not act—on the spot. It was reasonable for her to conclude that the banner promoted illegal drug use—in violation of established school policy—and that failing to act would send a powerful message to the students in her charge, including Frederick, about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers.

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Thomas, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 06–278

————

## DEBORAH MORSE, ET AL., PETITIONERS v. JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE THOMAS, concurring.

The Court today decides that a public school may prohibit speech advocating illegal drug use. I agree and therefore join its opinion in full. I write separately to state my view that the standard set forth in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), is without basis in the Constitution.

I

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." As this Court has previously observed, the First Amendment was not originally understood to permit all sorts of speech; instead, "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942); see also *Cox* v. *Louisiana*, 379 U. S. 536, 554 (1965). In my view, the history of public education suggests that the First Amendment, as originally understood, does not protect student speech in public schools. Although colonial schools were exclusively private, public education proliferated in the early 1800's. By the time the States ratified the Fourteenth Amendment, public schools had become relatively common. W. Reese, America's

Thomas, J., concurring

Public Schools: From the Common School to "No Child
Left Behind" 11–12 (2005) (hereinafter Reese).  If students
in public schools were originally understood as having
free-speech rights, one would have expected 19th-century
public schools to have respected those rights and courts to
have enforced them.[1]  They did not.

A

During the colonial era, private schools and tutors of-
fered the only educational opportunities for children, and
teachers managed classrooms with an iron hand.  R. Butts
& L. Cremin, A History of Education in American Culture
121, 123 (1953) (hereinafter Butts).  Public schooling
arose, in part, as a way to educate those too poor to afford
private schools.  See Kaestle & Vinovskis, From Apron
Strings to ABCs: Parents, Children, and Schooling in
Nineteenth-Century Massachusetts, 84 Am. J. Sociology
S39, S49 (Supp. 1978).  Because public schools were ini-
tially created as substitutes for private schools, when
States developed public education systems in the early
1800's, no one doubted the government's ability to educate
and discipline children as private schools did.  Like their
private counterparts, early public schools were not places
for freewheeling debates or exploration of competing ideas.
Rather, teachers instilled "a core of common values" in
students and taught them self-control.  Reese 23; A. Potter
& G. Emerson, The School and the Schoolmaster: A Man-
ual 125 (1843) ("By its discipline it contributes, insensibly,
to generate a spirit of subordination to lawful authority, a
power of self-control, and a habit of postponing present
indulgence to a greater future good . . ."); D. Parkerson &

-----------

[1]Although the First Amendment did not apply to the States until at
least the ratification of the Fourteenth Amendment, most state consti-
tutions included free-speech guarantees during the period when public
education expanded.  *E.g.,* Cal. Const., Art. I, §9 (1849); Conn. Const.,
Art. I, §5 (1818); Ind. Const., Art. I, §9 (1816).

THOMAS, J., concurring

J. Parkerson, The Emergence of the Common School in the U. S. Countryside 6 (1998) (hereinafter Parkerson) (noting that early education activists, such as Benjamin Rush, believed public schools "help[ed] control the innate self-ishness of the individual").

Teachers instilled these values not only by presenting ideas but also through strict discipline. Butts 274–275. Schools punished students for behavior the school considered disrespectful or wrong. Parkerson 65 (noting that children were punished for idleness, talking, profanity, and slovenliness). Rules of etiquette were enforced, and courteous behavior was demanded. Reese 40. To meet their educational objectives, schools required absolute obedience. C. Northend, The Teacher's Assistant or Hints and Methods in School Discipline and Instruction 44, 52 (1865) ("I consider a school judiciously governed, where order prevails; where the strictest sense of propriety is manifested by the pupils towards the teacher, and towards each other . . ." (internal quotation marks omitted)).[2]

In short, in the earliest public schools, teachers taught, and students listened. Teachers commanded, and students obeyed. Teachers did not rely solely on the power of ideas to persuade; they relied on discipline to maintain order.

## B

Through the legal doctrine of *in loco parentis*, courts upheld the right of schools to discipline students, to en-

---

[2] Even at the college level, strict obedience was required of students: "The English model fostered absolute institutional control of students by faculty both inside and outside the classroom. At all the early American schools, students lived and worked under a vast array of rules and restrictions. This one-sided relationship between the student and the college mirrored the situation at English schools where the emphasis on hierarchical authority stemmed from medieval Christian theology and the unique legal privileges afforded the university corporation." Note, 44 Vand. L. Rev. 1135, 1140 (1991) (footnote omitted).

4                    MORSE *v.* FREDERICK

Thomas, J., concurring

force rules, and to maintain order.[3]  Rooted in the English
common law, *in loco parentis* originally governed the legal
rights and obligations of tutors and private schools.  1 W.
Blackstone, Commentaries on the Laws of England 441
(1765) ("[A parent] may also delegate part of his parental
authority, during his life, to the tutor or schoolmaster of
his child; who is then *in loco parentis*, and has such a
portion of the power of the parent committed to his charge,
viz. that of restraint and correction, as may be necessary
to answer the purposes for which he is employed").  Chan-
cellor James Kent noted the acceptance of the doctrine as
part of American law in the early 19th century.  2 J. Kent,
Commentaries on American Law *205, *206–*207 ("So the
power allowed by law to the parent over the person of the
child may be delegated to a tutor or instructor, the better
to accomplish the purpose of education").

   As early as 1837, state courts applied the *in loco par-
entis* principle to public schools:

   "One of the most sacred duties of parents, is to train
   up and qualify their children, for becoming useful and
   virtuous members of society; this duty cannot be effec-
   tually performed without the ability to command obe-
   dience, to control stubbornness, to quicken diligence,
   and to reform bad habits . . . .  The teacher is the sub-
   stitute of the parent; . . . and in the exercise of these
   delegated duties, is invested with his power."  *State* v.

   ──────────

   [3]My discussion is limited to elementary and secondary education.  In
these settings, courts have applied the doctrine of *in loco parentis*
regardless of the student's age.  See, *e.g., Stevens* v. *Fassett,* 27 Me. 266,
281 (1847) (holding that a student over the age of 21 is "liab[le] to
punishment" on the same terms as other students if he "present[s]
himself as a pupil, [and] is received and instructed by the master");
*State* v. *Mizner,* 45 Iowa 248, 250–252 (1876) (same); *Sheehan* v.
*Sturges,* 53 Conn. 481, 484, 2 A. 841, 843 (1885) (same).  Therefore, the
fact that Frederick was 18 and not a minor under Alaska law, 439 F. 3d
1114, 1117, n. 4 (CA9 2006), is inconsequential.

THOMAS, J., concurring

*Pendergrass*, 19 N. C. 365, 365–366, (1837).

Applying *in loco parentis*, the judiciary was reluctant to interfere in the routine business of school administration, allowing schools and teachers to set and enforce rules and to maintain order. *Sheehan* v. *Sturges,* 53 Conn. 481, 483–484, 2 A. 841, 842 (1885). Thus, in the early years of public schooling, schools and teachers had considerable discretion in disciplinary matters:

> "To accomplish th[e] desirable ends [of teaching self-restraint, obedience, and other civic virtues], the master of a school is necessarily invested with much discretionary power. . . . He must govern these pupils, quicken the slothful, spur the indolent, restrain the impetuous, and control the stubborn. He must make rules, give commands, and punish disobedience. What rules, what commands, and what punishments shall be imposed, are necessarily largely within the discretion of the master, where none are defined by the school board." *Patterson* v. *Nutter*, 78 Me. 509, 511, 7 A. 273, 274 (1886).[4]

A review of the case law shows that *in loco parentis* allowed schools to regulate student speech as well. Courts routinely preserved the rights of teachers to punish speech that the school or teacher thought was contrary to the interests of the school and its educational goals. For example, the Vermont Supreme Court upheld the corporal punishment of a student who called his teacher *"Old Jack Seaver"* in front of other students. *Lander* v. *Seaver*, 32 Vt. 114, 115 (1859). The court explained its decision as

---

[4] Even courts that did not favor the broad discretion given to teachers to impose corporal punishment recognized that the law provided it. *Cooper* v. *McJunkin*, 4 Ind. 290, 291 (1853) (stating that "[t]he public seem to cling to a despotism in the government of schools which has been discarded everywhere else").

follows:

> "[L]anguage used to other scholars to stir up disorder
> and subordination, or to heap odium and disgrace
> upon the master; writings and pictures placed so as to
> suggest evil and corrupt language, images and
> thoughts to the youth who must frequent the school;
> all such or similar acts tend directly to impair the use-
> fulness of the school, the welfare of the scholars and
> the authority of the master.  By common consent and
> by the universal custom in our New England schools,
> the master has always been deemed to have the right
> to punish such offences.  Such power is essential to
> the preservation of order, decency, decorum and good
> government in schools." *Id.,* at 121.

Similarly, the California Court of Appeal upheld the
expulsion of a student who gave a speech before the stu-
dent body that criticized the administration for having an
unsafe building "because of the possibility of fire." *Wooster*
v. *Sunderland*, 27 Cal. App. 51, 52, 148 P. 959, (1915).
The punishment was appropriate, the court stated, be-
cause the speech "was intended to discredit and humiliate
the board in the eyes of the students, and tended to impair
the discipline of the school."  *Id.,* at 55, 148 P., at 960.
Likewise, the Missouri Supreme Court explained that a
"rule which forbade the use of profane language [and]
quarrelling" "was not only reasonable, but necessary to the
orderly conduct of the school." *Deskins* v. *Gose*, 85 Mo.
485, 487, 488 (1885).  And the Indiana Supreme Court
upheld the punishment of a student who made distracting
demonstrations in class for "a breach of good deportment."
*Vanvactor* v. *State*, 113 Ind. 276, 281, 15 N. E. 341, 343
(1888).[5]

---

[5] Courts also upheld punishment when children refused to speak after
being requested to do so by their teachers.  See *Board of Ed.* v. *Helston*,
32 Ill. App. 300, 305–307 (1890) (upholding the suspension of a boy who

Cite as: 551 U. S. ____ (2007)            7

THOMAS, J., concurring

The doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way.  It merely limited the imposition of excessive physical punishment.  In this area, the case law was split. One line of cases specified that punishment was wholly discretionary as long as the teacher did not act with legal malice or cause permanent injury.  *E.g., Boyd* v. *State*, 88 Ala. 169, 170–172, 7 So. 268, 269 (1890) (allowing liability where the "punishment inflicted is immoderate or excessive, and . . . it was induced by legal malice, or wickedness of motive").  Another line allowed courts to intervene where the corporal punishment was "*clearly* excessive." *E.g., Lander, supra*, at 124.  Under both lines of cases, courts struck down only punishments that were excessively harsh; they almost never questioned the substantive restrictions on student conduct set by teachers and schools.  *E.g., Sheehan, supra*, at 483–484, 2 A., at 842; *Gardner* v. *State*, 4 Ind. 632, 635 (1853); *Anderson* v. *State*, 40 Tenn. 455, 456 (1859); *Hardy* v. *James*, 5 Ky. Op. 36 (1872).[6]

––––––––

refused to provide information about who had defaced the school building); cf. *Sewell* v. *Board of Ed. of Defiance Union School,* 29 Ohio St. 89, 92 (1876) (upholding the suspension of a student who failed to complete a rhetorical exercise in the allotted time).

[6]At least nominally, this Court has continued to recognize the applicability of the *in loco parentis* doctrine to public schools.  See *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 654, 655 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination . . . . They are subject . . . to the control of their parents or guardians.  When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them" (citation omitted)); *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 684 (1986) ("These cases recognize the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech").

## II

*Tinker* effected a sea change in students' speech rights, extending them well beyond traditional bounds. The case arose when a school punished several students for wearing black armbands to school to protest the Vietnam War. *Tinker*, 393 U. S., at 504. Determining that the punishment infringed the students' First Amendment rights, this Court created a new standard for students' freedom of speech in public schools:

> "[W]here there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained." *Id.,* at 509 (internal quotation marks omitted).

Accordingly, unless a student's speech would disrupt the educational process, students had a fundamental right to speak their minds (or wear their armbands)—even on matters the school disagreed with or found objectionable. *Ibid.* ("[The school] must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

Justice Black dissented, criticizing the Court for "subject[ing] all the public schools in the country to the whims and caprices of their loudest-mouthed, but maybe not their brightest, students." *Id.,* at 525. He emphasized the instructive purpose of schools: "[T]axpayers send children to school on the premise that at their age they need to learn, not teach." *Id.,* at 522. In his view, the Court's decision "surrender[ed] control of the American public school system to public school students." *Id.,* at 526.

Of course, *Tinker*'s reasoning conflicted with the traditional understanding of the judiciary's role in relation to public schooling, a role limited by *in loco parentis*. Per-

haps for that reason, the Court has since scaled back *Tinker*'s standard, or rather set the standard aside on an ad hoc basis. In *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 677, 678 (1986), a public school suspended a student for delivering a speech that contained "an elaborate, graphic, and explicit sexual metaphor." The Court of Appeals found that the speech caused no disruption under the *Tinker* standard, and this Court did not question that holding. 478 U. S., at 679–680. The Court nonetheless permitted the school to punish the student because of the objectionable content of his speech. *Id.*, at 685 ("A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students"). Signaling at least a partial break with *Tinker*, *Fraser* left the regulation of indecent student speech to local schools.[7] 478 U. S., at 683.

Similarly, in *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988), the Court made an exception to *Tinker* for school-sponsored activities. The Court characterized newspapers and similar school-sponsored activities "as part of the school curriculum" and held that "[e]ducators are entitled to exercise greater control over" these forms of student expression. 484 U. S., at 271. Accordingly, the Court expressly refused to apply *Tinker*'s standard. 484 U. S., at 272–273. Instead, for school-sponsored activities, the Court created a new standard that permitted school regulations of student speech that are "reasonably related to legitimate pedagogical concerns." *Id.*, at 273.

Today, the Court creates another exception. In doing so, we continue to distance ourselves from *Tinker*, but we neither overrule it nor offer an explanation of when it operates and when it does not. *Ante*, at 10–14. I am afraid that our jurisprudence now says that students have

———————

[7]Distancing itself from *Tinker*'s approach, the *Fraser* Court quoted Justice Black's dissent in *Tinker*. 478 U. S., at 686.

THOMAS, J., concurring

a right to speak in schools except when they don't—a standard continuously developed through litigation against local schools and their administrators. In my view, petitioners could prevail for a much simpler reason: As originally understood, the Constitution does not afford students a right to free speech in public schools.

### III

In light of the history of American public education, it cannot seriously be suggested that the First Amendment "freedom of speech" encompasses a student's right to speak in public schools. Early public schools gave total control to teachers, who expected obedience and respect from students. And courts routinely deferred to schools' authority to make rules and to discipline students for violating those rules. Several points are clear: (1) under *in loco parentis*, speech rules and other school rules were treated identically; (2) the *in loco parentis* doctrine imposed almost no limits on the types of rules that a school could set while students were in school; and (3) schools and teachers had tremendous discretion in imposing punishments for violations of those rules.

It might be suggested that the early school speech cases dealt only with slurs and profanity. But that criticism does not withstand scrutiny. First, state courts repeatedly reasoned that schools had discretion to impose discipline to maintain order. The substance of the student's speech or conduct played no part in the analysis. Second, some cases involved punishment for speech on weightier matters, for instance a speech criticizing school administrators for creating a fire hazard. See *Wooster*, 27 Cal. App., at 52–53, 148 P., at 959. Yet courts refused to find an exception to *in loco parentis* even for this advocacy of public safety.

To be sure, our educational system faces administrative and pedagogical challenges different from those faced by

19th-century schools.  And the idea of treating children as though it were still the 19th century would find little support today.  But I see no constitutional imperative requiring public schools to allow all student speech.  Parents decide whether to send their children to public schools.  Cf. *Hamilton* v. *Regents of Univ. of Cal.*, 293 U. S. 245, 262 (1934) ("California has not drafted or called them to attend the university.  They are seeking education offered by the State and at the same time insisting that they be excluded from the prescribed course . . ."); *id.*, at 266 (Cardozo, J., concurring).  If parents do not like the rules imposed by those schools, they can seek redress in school boards or legislatures; they can send their children to private schools or home school them; or they can simply move.  Whatever rules apply to student speech in public schools, those rules can be challenged by parents in the political process.

In place of that democratic regime, *Tinker* substituted judicial oversight of the day-to-day affairs of public schools.  The *Tinker* Court made little attempt to ground its holding in the history of education or in the original understanding of the First Amendment.[8]  Instead, it im-

---

[8]The *Tinker* Court claimed that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.  This has been the unmistakable holding of this Court for almost 50 years." 393 U. S., at 506.  But the cases the Court cited in favor of that bold proposition do not support it.  *Tinker* chiefly relies upon *Meyer* v. *Nebraska*, 262 U. S. 390 (1923) (striking down a law prohibiting the teaching of German).  However, *Meyer* involved a challenge by a *private* school, *id.*, at 396, and the *Meyer* Court was quick to note that no "challenge [has] been made of the State's power to prescribe a curriculum for institutions which it supports." *Id.*, at 402.  *Meyer* provides absolutely no support for the proposition that that free-speech rights apply within schools operated by the State.  And notably, *Meyer* relied as its chief support on the *Lochner* v. *New York,* 198 U. S. 45 (1905), line of cases, 262 U. S., at 399, a line of cases that has long been criticized, *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority,* 550 U. S.

THOMAS, J., concurring

posed a new and malleable standard: Schools could not
inhibit student speech unless it "substantially interfere[d]
with the requirements of appropriate discipline in the
operation of the school." 393 U. S., at 509 (internal quota-
tion marks omitted). Inherent in the application of that
standard are judgment calls about what constitutes inter-
ference and what constitutes appropriate discipline. See
*id.*, at 517–518 (Black, J., dissenting) (arguing that the
armbands in fact caused a disruption). Historically, courts
reasoned that only local school districts were entitled to
make those calls. The *Tinker* Court usurped that tradi-
tional authority for the judiciary.

And because *Tinker* utterly ignored the history of public
education, courts (including this one) routinely find it
necessary to create ad hoc exceptions to its central prem-
ise. This doctrine of exceptions creates confusion without
fixing the underlying problem by returning to first princi-
ples. Just as I cannot accept *Tinker*'s standard, I cannot
subscribe to *Kuhlmeier*'s alternative. Local school boards,
not the courts, should determine what pedagogical inter-
ests are "legitimate" and what rules "reasonably relat[e]"
to those interests. 484 U. S., at 273.

Justice Black may not have been "a prophet or the son of
a prophet," but his dissent in *Tinker* has proved prophetic.
393 U. S., at 525. In the name of the First Amendment,
*Tinker* has undermined the traditional authority of teach-
ers to maintain order in public schools. "Once a society
that generally respected the authority of teachers, de-
ferred to their judgment, and trusted them to act in the
best interest of school children, we now accept defiance,
disrespect, and disorder as daily occurrences in many of

———
__ (2007). *Tinker* also relied on *Pierce* v. *Society of Sisters*, 268 U. S.
510 (1925). *Pierce* has nothing to say on this issue either. *Pierce*
simply upheld the right of parents to send their children to private
school. *Id.*, at 535.

Thomas, J., concurring

our public schools."  Dupre, Should Students Have Constitutional Rights? Keeping Order in the Public Schools, 65 Geo. Wash. L. Rev. 49, 50 (1996).  We need look no further than this case for an example: Frederick asserts a constitutional right to utter at a school event what is either "[g]ibberish," *ante*, at 7, or an open call to use illegal drugs.  To elevate such impertinence to the status of constitutional protection would be farcical and would indeed be to "surrender control of the American public school system to public school students." *Tinker*, *supra*, at 526 (Black, J., dissenting).

\*    \*    \*

I join the Court's opinion because it erodes *Tinker*'s hold in the realm of student speech, even though it does so by adding to the patchwork of exceptions to the *Tinker* standard.  I think the better approach is to dispense with *Tinker* altogether, and given the opportunity, I would do so.

Cite as: 551 U. S. ____ (2007)          1

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 06–278

————

## DEBORAH MORSE, ET AL., PETITIONERS v. JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE ALITO, with whom JUSTICE KENNEDY joins, concurring.

I join the opinion of the Court on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as "the wisdom of the war on drugs or of legalizing marijuana for medicinal use." See *post*, at 13 (STEVENS, J., dissenting).

The opinion of the Court correctly reaffirms the recognition in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969), of the fundamental principle that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  The Court is also correct in noting that *Tinker,* which permits the regulation of student speech that threatens a concrete and "substantial disruption," *id.,* at 514, does not set out the only ground on which in-school student speech may be regulated by state actors in a way

that would not be constitutional in other settings.

But I do not read the opinion to mean that there are necessarily any grounds for such regulation that are not already recognized in the holdings of this Court. In addition to *Tinker*, the decision in the present case allows the restriction of speech advocating illegal drug use; *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675 (1986), permits the regulation of speech that is delivered in a lewd or vulgar manner as part of a middle school program; and *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988), allows a school to regulate what is in essence the school's own speech, that is, articles that appear in a publication that is an official school organ. I join the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions.

The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school's "educational mission." See Brief for Petitioners 21; Brief for United States as *Amicus Curiae* 6. This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs. The "educational mission" of the public schools is defined by the elected and appointed public officials with authority over the schools and by the school administrators and faculty. As a result, some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of these groups.

During the *Tinker* era, a public school could have defined its educational mission to include solidarity with our soldiers and their families and thus could have attempted to outlaw the wearing of black armbands on the ground that they undermined this mission. Alternatively, a

school could have defined its educational mission to in-
clude the promotion of world peace and could have sought
to ban the wearing of buttons expressing support for the
troops on the ground that the buttons signified approval of
war.  The "educational mission" argument would give
public school authorities a license to suppress speech on
political and social issues based on disagreement with the
viewpoint expressed.  The argument, therefore, strikes at
the very heart of the First Amendment.

The public schools are invaluable and beneficent institu-
tions, but they are, after all, organs of the State.  When
public school authorities regulate student speech, they act
as agents of the State; they do not stand in the shoes of
the students' parents.  It is a dangerous fiction to pretend
that parents simply delegate their authority—including
their authority to determine what their children may say
and hear—to public school authorities.   It is even more
dangerous to assume that such a delegation of authority
somehow strips public school authorities of their status as
agents of the State.  Most parents, realistically, have no
choice but to send their children to a public school and
little ability to influence what occurs in the school.  It is
therefore wrong to treat public school officials, for pur-
poses relevant to the First Amendment, as if they were
private, nongovernmental actors standing *in loco parentis.*

For these reasons, any argument for altering the usual
free speech rules in the public schools cannot rest on a
theory of delegation but must instead be based on some
special characteristic of the school setting.  The special
characteristic that is relevant in this case is the threat to
the physical safety of students. School attendance can
expose students to threats to their physical safety that
they would not otherwise face.  Outside of school, parents
can attempt to protect their children in many ways and
may take steps to monitor and exercise control over the
persons with whom their children associate.  Similarly,

4                    MORSE *v.* FREDERICK

ALITO, J., concurring

students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. Experience shows that schools can be places of special danger.

In most settings, the First Amendment strongly limits the government's ability to suppress speech on the ground that it presents a threat of violence. See *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969) *(per curiam)*. But due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence. And, in most cases, *Tinker*'s "substantial disruption" standard permits school officials to step in before actual violence erupts. See 393 U. S., at 508–509.

Speech advocating illegal drug use poses a threat to student safety that is just as serious, if not always as immediately obvious. As we have recognized in the past and as the opinion of the Court today details, illegal drug use presents a grave and in many ways unique threat to the physical safety of students. I therefore conclude that the public schools may ban speech advocating illegal drug use. But I regard such regulation as standing at the far reaches of what the First Amendment permits. I join the opinion of the Court with the understanding that the opinion does not endorse any further extension.

Cite as: 551 U. S. ____ (2007)          1

Opinion of BREYER, J.

# SUPREME COURT OF THE UNITED STATES

————————

No. 06–278

————————

## DEBORAH MORSE, ET AL., PETITIONERS v. JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE BREYER, concurring in the judgment in part
and dissenting in part.

This Court need not and should not decide this difficult
First Amendment issue on the merits. Rather, I believe
that it should simply hold that qualified immunity bars
the student's claim for monetary damages and say no
more.

I

Resolving the First Amendment question presented in
this case is, in my view, unwise and unnecessary. In part
that is because the question focuses upon specific content
narrowly defined: May a school board punish students for
speech that advocates drug use and, if so, when? At the
same time, the underlying facts suggest that Principal
Morse acted as she did not simply because of the specific
content and viewpoint of Joseph Frederick's speech but
also because of the surrounding context and manner in
which Frederick expressed his views. To say that school
officials might reasonably prohibit students during school-
related events from unfurling 14-foot banners (with any
kind of irrelevant or inappropriate message) designed to
attract attention from television cameras seems unlikely
to undermine basic First Amendment principles. But to
hold, as the Court does, that "schools may take steps to

safeguard those entrusted to their care from speech that
can reasonably be regarded as encouraging illegal drug
use" (and that "schools" may "restrict student expression
that they reasonably regard as promoting illegal drug
use") is quite a different matter. *Ante*, at 2, 14. This
holding, based as it is on viewpoint restrictions, raises a
host of serious concerns.

One concern is that, while the holding is theoretically
limited to speech promoting the use of illegal drugs, it
could in fact authorize further viewpoint-based restric-
tions. Illegal drugs, after all, are not the only illegal sub-
stances. What about encouraging the underage consump-
tion of alcohol? Moreover, it is unclear how far the Court's
rule regarding drug advocacy extends. What about a
conversation during the lunch period where one student
suggests that glaucoma sufferers should smoke marijuana
to relieve the pain? What about deprecating commentary
about an antidrug film shown in school? And what about
drug messages mixed with other, more expressly political,
content? If, for example, Frederick's banner had read
"LEGALIZE BONG HiTS," he might be thought to receive
protection from the majority's rule, which goes to speech
"encouraging *illegal* drug use." *Ante*, at 2 (emphasis
added). But speech advocating change in drug laws might
also be perceived of as promoting the disregard of existing
drug laws.

Legal principles must treat like instances alike. Those
principles do not permit treating "drug use" separately
without a satisfying explanation of why drug use is *sui
generis*. To say that illegal drug use is harmful to stu-
dents, while surely true, does not itself constitute a satis-
fying explanation because there are many such harms.
During a real war, one less metaphorical than the war on
drugs, the Court declined an opportunity to draw narrow
subject-matter-based lines. Cf. *West Virginia Bd. of Ed.* v.
*Barnette*, 319 U. S. 624 (1943) (holding students cannot be

Opinion of BREYER, J.

compelled to recite the Pledge of Allegiance during World War II). We should decline this opportunity today.

Although the dissent avoids some of the majority's pitfalls, I fear that, if adopted as law, it would risk significant interference with reasonable school efforts to maintain discipline. What is a principal to do when a student unfurls a 14-foot banner (carrying an irrelevant or inappropriate message) during a school-related event in an effort to capture the attention of television cameras? Nothing? In my view, a principal or a teacher might reasonably view Frederick's conduct, in this setting, as simply beyond the pale. And a school official, knowing that adolescents often test the outer boundaries of acceptable behavior, may believe it is important (for the offending student and his classmates) to establish when a student has gone too far.

Neither can I simply say that Morse may have taken the right action (confiscating Frederick's banner) but for the wrong reason ("drug speech"). Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence. As the majority rightly points out, the circumstances here called for a quick decision. See *ante*, at 15 (noting that "Morse had to decide to act— or not act—on the spot"). But this consideration is better understood in terms of qualified immunity than of the First Amendment. See *infra,* at 5–8.

All of this is to say that, regardless of the outcome of the constitutional determination, a decision on the underlying First Amendment issue is both difficult and unusually portentous. And that is a reason for us *not to decide* the issue unless we must.

In some instances, it is appropriate to decide a constitutional issue in order to provide "guidance" for the future. But I cannot find much guidance in today's decision. The Court makes clear that school officials may "restrict"

Opinion of BREYER, J.

student speech that promotes "illegal drug use" and that they may "take steps" to "safeguard" students from speech that encourages "illegal drug use." *Ante*, at 2, 8. Beyond "steps" that prohibit the unfurling of banners at school outings, the Court does not explain just what those "restrict[ions]" or those "steps" might be.

Nor, if we are to avoid the risk of interpretations that are too broad or too narrow, is it easy to offer practically valuable guidance. Students will test the limits of acceptable behavior in myriad ways better known to school-teachers than to judges; school officials need a degree of flexible authority to respond to disciplinary challenges; and the law has always considered the relationship between teachers and students special. Under these circumstances, the more detailed the Court's supervision becomes, the more likely its law will engender further disputes among teachers and students. Consequently, larger numbers of those disputes will likely make their way from the schoolhouse to the courthouse. Yet no one wishes to substitute courts for school boards, or to turn the judge's chambers into the principal's office.

In order to avoid resolving the fractious underlying constitutional question, we need only decide a different question that this case presents, the question of "qualified immunity." See Pet. for Cert. 23–28. The principle of qualified immunity fits this case perfectly and, by saying so, we would diminish the risk of bringing about the adverse consequences I have identified. More importantly, we should also adhere to a basic constitutional obligation by avoiding unnecessary decision of constitutional questions. See *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented on the record, if there is also present some other ground upon which the case may be disposed of").

Opinion of BREYER, J.

## II
## A

The defense of "qualified immunity" requires courts to enter judgment in favor of a government employee unless the employee's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). The defense is designed to protect "all but the plainly incompetent or those who knowingly violated the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986).

Qualified immunity applies here and entitles Principal Morse to judgment on Frederick's monetary damages claim because she did not clearly violate the law during her confrontation with the student. At the time of that confrontation, *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 513 (1969), indicated that school officials could not prohibit students from wearing an armband in protest of the Vietnam War, where the conduct at issue did not "materially and substantially disrupt the work and discipline of the school;" *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675 (1986), indicated that school officials could restrict a student's freedom to give a school assembly speech containing an elaborate sexual metaphor; and *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260 (1988), indicated that school officials could restrict student contributions to a school-sponsored newspaper, even without threat of imminent disruption. None of these cases clearly governs the case at hand.

The Ninth Circuit thought it "clear" that these cases did not permit Morse's actions. See 439 F. 3d 1114, 1124 (2006). That is because, in the Ninth Circuit's view, this case involved neither lewd speech, cf. *Fraser, supra*, nor school sponsored speech, cf. *Kuhlmeier, supra*, and hence *Tinker*'s substantial disruption test must guide the inquiry. See 439 F. 3d, at 1123. But unlike the Ninth Cir-

cuit, other courts have described the tests these cases suggest as complex and often difficult to apply. See, *e.g.*, *Guiles ex rel. Guiles* v. *Marineau*, 461 F. 3d 320, 326 (CA2 2006) ("It is not entirely clear whether *Tinker*'s rule applies to all student speech that is not sponsored by schools, subject to the rule of *Fraser*, or whether it applies only to political speech or to political viewpoint-based discrimination"); *Baxter* v. *Vigo Cty. School Corp.*, 26 F. 3d 728, 737 (CA7 1994) (pointing out that *Fraser* "cast some doubt on the extent to which students retain free speech rights in the school setting"). Indeed, the fact that this Court divides on the constitutional question (and that the majority reverses the Ninth Circuit's constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear.

The relative ease with which we could decide this case on the qualified immunity ground, and thereby avoid deciding a far more difficult constitutional question, underscores the need to lift the rigid "order of battle" decisionmaking requirement that this Court imposed upon lower courts in *Saucier* v. *Katz*, 533 U. S. 194, 201–202 (2001). In *Saucier*, the Court wrote that lower courts' "first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Id.*, at 200. Only if there is a constitutional violation, can lower courts proceed to consider whether the official is entitled to "qualified immunity." See *ibid.*

I have previously explained why I believe we should abandon *Saucier*'s order-of-battle rule. See *Scott* v. *Harris*, 550 U. S. ___, ___ (2007) (slip op., at 1–2) (BREYER, J., concurring); *Brosseau* v. *Haugen*, 543 U. S. 194, 201–202 (2004) (BREYER, J., concurring). Sometimes the rule will require lower courts unnecessarily to answer difficult constitutional questions, thereby wasting judicial resources. Sometimes it will require them to resolve constitutional issues that are poorly presented. Sometimes the

Opinion of BREYER, J.

rule will immunize an incorrect constitutional holding from further review. And often the rule violates the long-standing principle that courts should "not . . . pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944).

This last point warrants amplification. In resolving the underlying constitutional question, we produce several differing opinions. It is utterly unnecessary to do so. Were we to decide this case on the ground of qualified immunity, our decision would be *unanimous*, for the dissent concedes that Morse should not be held liable in damages for confiscating Frederick's banner. *Post*, at 1 (opinion of STEVENS, J.). And the "cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc.* v. *Drug Enforcement Admin.*, 362 F. 3d 786, 799 (CADC 2004) (Roberts, J., concurring in part and concurring in judgment).

If it is *Saucier* that tempts this Court to adhere to the rigid "order of battle" that binds lower courts, it should resist that temptation. *Saucier* does not bind this Court. Regardless, the rule of *Saucier* has generated considerable criticism from both commentators and judges. See Leval, Judging Under the Constitution: Dicta About Dicta, 81 N. Y. U. L. Rev. 1249, 1275 (2006) (calling the requirement "a puzzling misadventure in constitutional dictum"); *Dirrane* v. *Brookline Police Dept.*, 315 F. 3d 65, 69–70 (CA1 2002) (referring to the requirement as "an uncomfortable exercise" when "the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed"); *Lyons* v. *Xenia*, 417 F. 3d 565, 580–584 (CA6 2005) (Sutton, J., concurring). While *Saucier* justified its rule by contending that it was necessary to permit constitutional law to develop, see 533 U. S., at 201, this concern is overstated because overruling *Saucier* would

not mean that the law *prohibited* judges from passing on constitutional questions, only that it did not *require* them to do so. Given that *Saucier* is a judge-made procedural rule, *stare decisis* concerns supporting preservation of the rule are weak. See, *e.g.*, *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991) ("Considerations in favor of *stare decisis*" are at their weakest in cases "involving procedural and evidentiary rules").

Finally, several Members of this Court have previously suggested that *always* requiring lower courts first to answer constitutional questions is misguided. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 859 (1998) (STEVENS, J., concurring in judgment) (resolving the constitutional question first is inappropriate when that "question is both difficult and unresolved"); *Bunting* v. *Mellen*, 541 U. S. 1019, 1025 (2004) (SCALIA, J., dissenting from denial of certiorari) ("We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case"); *Saucier, supra*, at 210 (GINSBURG, J., concurring in judgment) ("The two-part test today's decision imposes holds large potential to confuse"); *Siegert* v. *Gilley*, 500 U. S. 226, 235 (1991) (KENNEDY, J., concurring) ("If it is plain that a plaintiff's required malice allegations are insufficient but there is some doubt as to the constitutional right asserted, it seems to reverse the usual ordering of issues to tell the trial and appellate courts that they should resolve the constitutional question first"). I would end the failed *Saucier* experiment now.

### B

There is one remaining objection to deciding this case on the basis of qualified immunity alone. The plaintiff in this case has sought not only damages; he has also sought an injunction requiring the school district to expunge his suspension from its records. A "qualified immunity" de-

Opinion of BREYER, J.

fense applies in respect to damages actions, but not to injunctive relief. See, *e.g.*, *Wood* v. *Strickland*, 420 U. S. 308, 314, n. 6 (1975). With respect to that claim, the underlying question of constitutionality, at least conceivably, remains.

I seriously doubt, however, that it does remain. At the plaintiff's request, the school superintendent reviewed Frederick's 10-day suspension. The superintendent, in turn, reduced the suspension to the eight days that Frederick had served before the appeal. But in doing so the superintendent noted that several actions independent of Frederick's speech supported the suspension, including the plaintiff's disregard of a school official's instruction, his failure to report to the principal's office on time, his "defiant [and] disruptive behavior," and the "belligerent attitude" he displayed when he finally reported. App. to Pet. for Cert. 65a. The superintendent wrote that "were" he to "concede" that Frederick's "speech . . . is protected, . . . the remainder of his behavior was not excused." *Id.,* at 66a.

The upshot is that the school board's refusal to erase the suspension from the record may well be justified on non-speech-related grounds. In addition, plaintiff's counsel appeared to agree with the Court's suggestion at oral argument that Frederick "would not pursue" injunctive relief if he prevailed on the damages question. Tr. of Oral Arg. 46–48. And finding that Morse was entitled to qualified immunity would leave only the question of injunctive relief.

Given the high probability that Frederick's request for an injunction will not require a court to resolve the constitutional issue, see *Ashwander*, 297 U. S., at 347 (Brandeis, J., concurring), I would decide only the qualified immunity question and remand the rest of the case for an initial consideration.

Cite as: 551 U. S. ____ (2007)          1

STEVENS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–278

_____

## DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

A significant fact barely mentioned by the Court sheds a revelatory light on the motives of both the students and the principal of Juneau-Douglas High School (JDHS). On January 24, 2002, the Olympic Torch Relay gave those Alaska residents a rare chance to appear on national television. As Joseph Frederick repeatedly explained, he did not address the curious message—"BONG HiTS 4 JESUS"—to his fellow students. He just wanted to get the camera crews' attention. Moreover, concern about a nationwide evaluation of the conduct of the JDHS student body would have justified the principal's decision to remove an attention-grabbing 14-foot banner, even if it had merely proclaimed "Glaciers Melt!"

I agree with the Court that the principal should not be held liable for pulling down Frederick's banner. See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). I would hold, however, that the school's interest in protecting its students from exposure to speech "reasonably regarded as promoting illegal drug use," *ante*, at 1, cannot justify disciplining Frederick for his attempt to make an ambiguous statement to a television audience simply because it contained an oblique reference to drugs. The First Amendment demands more, indeed, much more.

The Court holds otherwise only after laboring to establish two uncontroversial propositions: first, that the constitutional rights of students in school settings are not coextensive with the rights of adults, see *ante*, at 8–12; and second, that deterring drug use by schoolchildren is a valid and terribly important interest, see *ante*, at 12–14. As to the first, I take the Court's point that the message on Frederick's banner is not *necessarily* protected speech, even though it unquestionably would have been had the banner been unfurled elsewhere.  As to the second, I am willing to assume that the Court is correct that the pressing need to deter drug use supports JDHS's rule prohibiting willful conduct that expressly "advocates the use of substances that are illegal to minors."  App. to Pet. for Cert. 53a.  But it is a gross non sequitur to draw from these two unremarkable propositions the remarkable conclusion that the school may suppress student speech that was never meant to persuade anyone to do anything.

In my judgment, the First Amendment protects student speech if the message itself neither violates a permissible rule nor expressly advocates conduct that is illegal and harmful to students.  This nonsense banner does neither, and the Court does serious violence to the First Amendment in upholding—indeed, lauding—a school's decision to punish Frederick for expressing a view with which it disagreed.

I

In December 1965, we were engaged in a controversial war, a war that "divided this country as few other issues ever have."  *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 524 (1969) (Black, J., dissenting).  Having learned that some students planned to wear black armbands as a symbol of opposition to the country's involvement in Vietnam, officials of the Des Moines public school district adopted a policy calling for the suspension

Stevens, J., dissenting

of any student who refused to remove the armband. As we explained when we considered the propriety of that policy, "[t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.,* at 508. The district justified its censorship on the ground that it feared that the expression of a controversial and unpopular opinion would generate disturbances. Because the school officials had insufficient reason to believe that those disturbances would "materially and substantially interfere with the requirements of discipline in the operation of the school," we found the justification for the rule to lack any foundation and therefore held that the censorship violated the First Amendment. *Id.,* at 509 (internal quotation marks omitted).

Justice Harlan dissented, but not because he thought the school district could censor a message with which it disagreed. Rather, he would have upheld the district's rule only because the students never cast doubt on the district's anti-disruption justification by proving that the rule was motivated "by other than legitimate school concerns—for example, a desire to prohibit the expression of an unpopular point of view while permitting expression of the dominant opinion." *Id.,* at 526.

Two cardinal First Amendment principles animate both the Court's opinion in *Tinker* and Justice Harlan's dissent. First, censorship based on the content of speech, particularly censorship that depends on the viewpoint of the speaker, is subject to the most rigorous burden of justification:

> "Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. View-

STEVENS, J., dissenting

point discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–829 (1995) (citation omitted).

Second, punishing someone for advocating illegal conduct is constitutional only when the advocacy is likely to provoke the harm that the government seeks to avoid. See *Brandenburg* v. *Ohio*, 395 U. S. 444, 449 (1969) *(per curiam)* (distinguishing "mere advocacy" of illegal conduct from "incitement to imminent lawless action").

However necessary it may be to modify those principles in the school setting, *Tinker* affirmed their continuing vitality. 393 U. S., at 509 ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in that conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained" (internal quotation marks omitted)). As other federal courts have long recognized, under *Tinker*,

"regulation of student speech is generally permissible only when the speech would substantially disrupt or interfere with the work of the school or the rights of other students. . . . *Tinker* requires a specific and significant fear of disruption, *not just some remote apprehension of disturbance.*" *Saxe* v. *State College Area School Dist.*, 240 F. 3d 200, 211 (CA3 2001) (Alito, J.) (emphasis added).

STEVENS, J., dissenting

   Yet today the Court fashions a test that trivializes the two cardinal principles upon which *Tinker* rests. See *ante,* at 14 ("[S]chools [may] restrict student expression that they reasonably regard as promoting illegal drug use"). The Court's test invites stark viewpoint discrimination. In this case, for example, the principal has unabashedly acknowledged that she disciplined Frederick because she disagreed with the pro-drug viewpoint she ascribed to the message on the banner, see App. 25—a viewpoint, incidentally, that Frederick has disavowed, see *id.,* at 28. Unlike our recent decision in *Tennessee Secondary School Athletic Assn.* v. *Brentwood Academy*, 551 U. S. ___, ___ (2007) (slip op., at 3), see also *ante,* at 3 (ALITO, J., concurring), the Court's holding in this case strikes at "the heart of the First Amendment" because it upholds a punishment meted out on the basis of a listener's disagreement with her understanding (or, more likely, misunderstanding) of the speaker's viewpoint. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989).

   It is also perfectly clear that "promoting illegal drug use," *ante,* at 14, comes nowhere close to proscribable "incitement to imminent lawless action." *Brandenburg*, 395 U. S., at 447. Encouraging drug use might well increase the likelihood that a listener will try an illegal drug, but that hardly justifies censorship:

   "Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. . . . Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying

STEVENS, J., dissenting

free speech where the advocacy falls short of incite-
ment and there is nothing to indicate that the advo-
cacy would be immediately acted upon." *Whitney* v.
*California*, 274 U. S. 357, 376 (1927) (Brandeis, J.,
concurring).

No one seriously maintains that drug advocacy (much less
Frederick's ridiculous sign) comes within the vanishingly
small category of speech that can be prohibited because of
its feared consequences. Such advocacy, to borrow from
Justice Holmes, "ha[s] no chance of starting a present
conflagration." *Gitlow* v. *New York*, 268 U. S. 652, 673
(1925) (dissenting opinion).

## II

The Court rejects outright these twin foundations of
*Tinker* because, in its view, the unusual importance of
protecting children from the scourge of drugs supports a
ban on all speech in the school environment that promotes
drug use. Whether or not such a rule is sensible as a
matter of policy, carving out pro-drug speech for uniquely
harsh treatment finds no support in our case law and is
inimical to the values protected by the First Amendment.[1]
See *infra*, at 14–16.

I will nevertheless assume for the sake of argument that
the school's concededly powerful interest in protecting its
students adequately supports its restriction on "any as-
sembly or public expression that . . . advocates the use of
substances that are illegal to minors . . . ." App. to Pet. for
Cert. 53a. Given that the relationship between schools
and students "is custodial and tutelary, permitting a
degree of supervision and control that could not be exer-
cised over free adults," *Vernonia School Dist. 47J* v. *Acton*,

────────────

[1] I also seriously question whether such a ban could really be en-
forced. Consider the difficulty of monitoring student conversations
between classes or in the cafeteria.

STEVENS, J., dissenting

515 U. S. 646, 655 (1995), it might well be appropriate to tolerate some targeted viewpoint discrimination in this unique setting. And while conventional speech may be restricted only when likely to "incit[e] imminent lawless action," *Brandenburg*, 395 U. S., at 449, it is possible that our rigid imminence requirement ought to be relaxed at schools. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 682 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings").

But it is one thing to restrict speech that *advocates* drug use. It is another thing entirely to prohibit an obscure message with a drug theme that a third party subjectively—and not very reasonably—thinks is tantamount to express advocacy. Cf. *Masses Publishing Co.* v. *Patten*, 244 F. 535, 540, 541 (SDNY 1917) (Hand, J.) (distinguishing sharply between "agitation, legitimate as such" and "the direct advocacy" of unlawful conduct). Even the school recognizes the paramount need to hold the line between, on the one hand, non-disruptive speech that merely expresses a viewpoint that is unpopular or contrary to the school's preferred message, and on the other hand, advocacy of an illegal or unsafe course of conduct. The district's prohibition of drug advocacy is a gloss on a more general rule that is otherwise quite tolerant of non-disruptive student speech:

> "Students will not be disturbed in the exercise of their constitutionally guaranteed rights to assemble peaceably and to express ideas and opinions, privately or publicly, provided that their activities do not infringe on the rights of others and do not interfere with the operation of the educational program.
>
> "The Board will not permit the conduct on school premises of any willful activity . . . that interferes with the orderly operation of the educational program

8                    MORSE *v.* FREDERICK

S<small>TEVENS</small>, J., dissenting

or offends the rights of others.  The Board specifically
prohibits . . . any assembly or public expression that
. . . advocates the use of substances that are illegal to
minors . . . ."  App. to Pet. for Cert. 53a; see also *ante*,
at 3 (quoting rule in part).

There is absolutely no evidence that Frederick's banner's
reference to drug paraphernalia "willful[ly]" infringed on
anyone's rights or interfered with any of the school's edu-
cational programs.[2]  On its face, then, the rule gave Fre-
derick wide berth "to express [his] ideas and opinions" so
long as they did not amount to "advoca[cy]" of drug use.
*Ibid.*  If the school's rule is, by hypothesis, a valid one, it is
valid only insofar as it scrupulously preserves adequate
space for constitutionally protected speech.  When First
Amendment rights are at stake, a rule that "sweep[s] in a
great variety of conduct under a general and indefinite
characterization" may not leave "too wide a discretion in
its application."  *Cantwell* v. *Connecticut*, 310 U. S. 296,
308 (1940).  Therefore, just as we insisted in *Tinker* that
the school establish some likely connection between the
armbands and their feared consequences, so too JDHS
must show that Frederick's supposed advocacy stands a
meaningful chance of making otherwise-abstemious stu-
dents try marijuana.

But instead of demanding that the school make such a
showing, the Court punts.  Figuring out just *how* it punts
is tricky; "[t]he mode of analysis [it] employ[s] is not en-
tirely clear," see *ante*, at 9.  On occasion, the Court sug-
gests it is deferring to the principal's "reasonable" judg-

_____

[2]It is also relevant that the display did not take place "on school
premises," as the rule contemplates.  App. to Pet. for Cert. 53a.  While a
separate district rule does make the policy applicable to "social events
and class trips," *id.,* at 58a, Frederick might well have thought that the
Olympic Torch Relay was neither a "social event" (for example, prom)
nor a "class trip."

Stevens, J., dissenting

ment that Frederick's sign qualified as drug advocacy.[3]  At other times, the Court seems to say that *it* thinks the banner's message constitutes express advocacy.[4]  Either way, its approach is indefensible.

To the extent the Court defers to the principal's ostensibly reasonable judgment, it abdicates its constitutional responsibility.  The beliefs of third parties, reasonable or otherwise, have never dictated which messages amount to proscribable advocacy.  Indeed, it would be a strange constitutional doctrine that would allow the prohibition of only the narrowest category of speech advocating unlawful conduct, see *Brandenburg*, 395 U. S., at 447–448, yet would permit a listener's perceptions to determine which speech deserved constitutional protection.[5]

Such a peculiar doctrine is alien to our case law.  In

_____

[3] See *ante,* at 1 (stating that the principal "reasonably regarded" Frederick's banner as "promoting illegal drug use"); *ante,* at 6 (explaining that "Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one"); *ante,* at 8 (asking whether "a principal may . . . restrict student speech . . . when that speech is reasonably viewed as promoting illegal drug use"); *ante,* at 14 (holding that "schools [may] restrict student expression that they reasonably regard as promoting illegal drug use"); see also *ante,* at 1 (Alito, J., concurring) ("[A] public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use").

[4] See *ante,* at 7 ("We agree with Morse.  At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs"); *ante,* at 15 (observing that "[w]e have explained our view" that "Frederick's banner constitutes promotion of illegal drug use").

[5] The reasonableness of the view that Frederick's message was unprotected speech is relevant to ascertaining whether qualified immunity should shield the principal from liability, not to whether her actions violated Frederick's constitutional rights.  Cf. *Saucier* v. *Katz,* 533 U. S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

10                    MORSE *v.* FREDERICK

*Abrams* v. *United States*, 250 U. S. 616 (1919), this Court affirmed the conviction of a group of Russian "rebels, revolutionists, [and] anarchists," *id.*, at 617–618 (internal quotation marks omitted), on the ground that the leaflets they distributed were thought to "incite, provoke, and encourage resistance to the United States," *id.*, at 617 (internal quotation marks omitted). Yet Justice Holmes' dissent—which has emphatically carried the day—never inquired into the reasonableness of the United States' judgment that the leaflets would likely undermine the war effort. The dissent instead ridiculed that judgment: "nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so." *Id.*, at 628. In *Thomas* v. *Collins*, 323 U. S. 516 (1945) (opinion for the Court by Rutledge, J.), we overturned the conviction of a union organizer who violated a restraining order forbidding him from exhorting workers. In so doing, we held that the distinction between advocacy and incitement could not depend on how one of those workers might have understood the organizer's speech. That would "pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning." *Id.*, at 535. In *Cox* v. *Louisiana*, 379 U. S. 536, 543 (1965), we vacated a civil rights leader's conviction for disturbing the peace, even though a Baton Rouge sheriff had "deem[ed]" the leader's "appeal to . . . students to sit in at the lunch counters to be 'inflammatory.'" We never asked if the sheriff's in-person, on-the-spot judgment was "reasonable." Even in *Fraser*, we made no inquiry into whether the school administrators reasonably thought the student's speech was obscene or profane; we rather satisfied ourselves that "[t]he pervasive sexual innuendo in

STEVENS, J., dissenting

Fraser's speech was plainly offensive to both teachers and students—indeed, to any mature person." 478 U. S., at 683. Cf. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 499 (1984) ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression" (internal quotation marks omitted)).[6]

To the extent the Court independently finds that "BONG HiTS 4 JESUS" *objectively* amounts to the advocacy of illegal drug use—in other words, that it can *most* reasonably be interpreted as such—that conclusion practically refutes itself. This is a nonsense message, not advocacy. The Court's feeble effort to divine its hidden meaning is strong evidence of that. *Ante*, at 7 (positing that the

_____

[6] This same reasoning applies when the interpreter is not just a listener, but a legislature. We have repeatedly held that "[d]eference to a legislative finding" that certain types of speech are inherently harmful "cannot limit judicial inquiry when First Amendment rights are at stake," reasoning that "the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution." *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 843, 844 (1978); see also *Whitney* v. *California*, 274 U. S. 357, 378–379 (1927) (Brandeis, J., concurring) ("[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution. . . . Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was so substantial as to justify the stringent restriction interposed by the legislature"). When legislatures are entitled to no deference as to whether particular speech amounts to a "clear and present danger," *id.,* at 379, it is hard to understand why the Court would so blithely defer to the judgment of a single school principal.

12                MORSE *v.* FREDERICK

STEVENS, J., dissenting

banner might mean, alternatively, "'[Take] bong hits,'"
"'bong hits [are a good thing],'" or "'[we take] bong hits'").
Frederick's credible and uncontradicted explanation for
the message—he just wanted to get on television—is also
relevant because a speaker who does not intend to per-
suade his audience can hardly be said to be advocating
anything.[7]  But most importantly, it takes real imagina-
tion to read a "cryptic" message (the Court's characteriza-
tion, not mine, see *ibid.,* at 6) with a slanting drug refer-
ence as an incitement to drug use.  Admittedly, some high
school students (including those who use drugs) are dumb.
Most students, however, do not shed their brains at the
schoolhouse gate, and most students know dumb advocacy
when they see it.  The notion that the message on this
banner would actually persuade either the average stu-
dent or even the dumbest one to change his or her behav-
ior is most implausible.  That the Court believes such a
silly message can be proscribed as advocacy underscores
the novelty of its position, and suggests that the principle
it articulates has no stopping point.

Even if advocacy could somehow be wedged into Freder-
ick's obtuse reference to marijuana, that advocacy was at
best subtle and ambiguous.  There is abundant precedent,
including another opinion THE CHIEF JUSTICE announces
today, for the proposition that when the "First Amend-
ment is implicated, the tie goes to the speaker," *Federal
Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S.
___ (2007) (slip op., at 21) and that "when it comes to
defining what speech qualifies as the functional equivalent
of express advocacy . . . we give the benefit of the doubt to
speech, not censorship," *post,* at 29.  If this were a close

---

[7] In affirming Frederick's suspension, the JDHS superintendent ac-
knowledged that Frederick displayed his message "for the benefit of
television cameras covering the Torch Relay."  App. to Pet. for Cert.
62a.

STEVENS, J., dissenting

case, the tie would have to go to Frederick's speech, not to the principal's strained reading of his quixotic message.

Among other things, the Court's ham-handed, categorical approach is deaf to the constitutional imperative to permit unfettered debate, even among high-school students, about the wisdom of the war on drugs or of legalizing marijuana for medicinal use.[8]  See *Tinker*, 393 U. S., at 511 ("[Students] may not be confined to the expression of those sentiments that are officially approved").  If Frederick's stupid reference to marijuana can in the Court's view justify censorship, then high school students everywhere could be forgiven for zipping their mouths about drugs at school lest some "reasonable" observer censor and then punish them for promoting drugs.  See also *ante*, at 2 (BREYER, J., concurring in judgment in part and dissenting in part).

Consider, too, that the school district's rule draws no distinction between alcohol and marijuana, but applies evenhandedly to all "substances that are illegal to mi-

---

[8]The Court's opinion ignores the fact that the legalization of marijuana is an issue of considerable public concern in Alaska.  The State Supreme Court held in 1975 that Alaska's constitution protects the right of adults to possess less than four ounces of marijuana for personal use.  *Ravin* v. *State*, 537 P. 2d 494 (Alaska).  In 1990, the voters of Alaska attempted to undo that decision by voting for a ballot initiative recriminalizing marijuana possession.  Initiative Proposal No. 2, §§1–2 (effective Mar. 3, 1991), 11 Alaska Stat., p. 872 (Lexis 2006).  At the time Frederick unfurled his banner, the constitutionality of that referendum had yet to be tested.  It was subsequently struck down as unconstitutional.  See *Noy* v. *State*, 83 P. 3d 538 (Alaska App. 2003).  In the meantime, Alaska voters had approved a ballot measure decriminalizing the use of marijuana for medicinal purposes, 1998 Ballot Measure No. 8 (approved Nov. 3, 1998), 11 Alaska Stat., p. 882 (codified at Alaska Stat. §§11.71.090, 17.37.010–17.37.080), and had rejected a much broader measure that would have decriminalized marijuana possession and granted amnesty to anyone convicted of marijuana-related crimes, see 2000 Ballot Measure No. 5 (failed Nov. 7, 2000), 11 Alaska Stat., p. 886.

14                    MORSE *v.* FREDERICK

STEVENS, J., dissenting

nors." App. to Pet. for Cert. 53a; see also App. 83 (expressly defining "'drugs'" to include "all alcoholic beverages"). Given the tragic consequences of teenage alcohol consumption—drinking causes far more fatal accidents than the misuse of marijuana—the school district's interest in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use. Under the Court's reasoning, must the First Amendment give way whenever a school seeks to punish a student for any speech mentioning beer, or indeed anything else that might be deemed risky to teenagers? While I find it hard to believe the Court would support punishing Frederick for flying a "WINE SiPS 4 JESUS" banner—which could quite reasonably be construed either as a protected religious message or as a pro-alcohol message—the breathtaking sweep of its opinion suggests it would.

III

Although this case began with a silly, nonsensical banner, it ends with the Court inventing out of whole cloth a special First Amendment rule permitting the censorship of any student speech that mentions drugs, at least so long as someone could perceive that speech to contain a latent pro-drug message. Our First Amendment jurisprudence has identified some categories of expression that are less deserving of protection than others—fighting words, obscenity, and commercial speech, to name a few. Rather than reviewing our opinions discussing such categories, I mention two personal recollections that have no doubt influenced my conclusion that it would be profoundly unwise to create special rules for speech about drug and alcohol use.

The Vietnam War is remembered today as an unpopular war. During its early stages, however, "the dominant opinion" that Justice Harlan mentioned in his *Tinker* dissent regarded opposition to the war as unpatriotic, if

STEVENS, J., dissenting

not treason. 393 U. S., at 526. That dominant opinion strongly supported the prosecution of several of those who demonstrated in Grant Park during the 1968 Democratic Convention in Chicago, see *United States* v. *Dellinger*, 472 F. 2d 340 (CA7 1972), and the vilification of vocal opponents of the war like Julian Bond, cf. *Bond* v. *Floyd*, 385 U. S. 116 (1966). In 1965, when the Des Moines students wore their armbands, the school district's fear that they might "start an argument or cause a disturbance" was well founded. *Tinker*, 393 U. S., at 508. Given that context, there is special force to the Court's insistence that "our Constitution says we must take that risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Id.,* at 508–509 (citation omitted). As we now know, the then-dominant opinion about the Vietnam War was not etched in stone.

Reaching back still further, the current dominant opinion supporting the war on drugs in general, and our anti-marijuana laws in particular, is reminiscent of the opinion that supported the nationwide ban on alcohol consumption when I was a student. While alcoholic beverages are now regarded as ordinary articles of commerce, their use was then condemned with the same moral fervor that now supports the war on drugs. The ensuing change in public opinion occurred much more slowly than the relatively rapid shift in Americans' views on the Vietnam War, and progressed on a state-by-state basis over a period of many years. But just as prohibition in the 1920's and early 1930's was secretly questioned by thousands of otherwise law-abiding patrons of bootleggers and speakeasies, today the actions of literally millions of otherwise law-abiding

STEVENS, J., dissenting

users of marijuana,[9] and of the majority of voters in each
of the several States that tolerate medicinal uses of the
product,[10] lead me to wonder whether the fear of disap-
proval by those in the majority is silencing opponents of
the war on drugs. Surely our national experience with
alcohol should make us wary of dampening speech sug-
gesting—however inarticulately—that it would be better
to tax and regulate marijuana than to persevere in a futile
effort to ban its use entirely.

Even in high school, a rule that permits only one point
of view to be expressed is less likely to produce correct
answers than the open discussion of countervailing views.
*Whitney*, 274 U. S., at 377 (Brandeis, J., concurring);
*Abrams*, 250 U. S., at 630 (Holmes, J., dissenting); *Tinker*,
393 U. S., at 512. In the national debate about a serious
issue, it is the expression of the minority's viewpoint that
most demands the protection of the First Amendment.
Whatever the better policy may be, a full and frank dis-
cussion of the costs and benefits of the attempt to prohibit
the use of marijuana is far wiser than suppression of
speech because it is unpopular.

I respectfully dissent.

---

[9] See *Gonzales* v. *Raich*, 545 U. S. 1, 21, n. 31 (2005) (citing a Gov-
ernment estimate "that in 2000 American users spent $10.5 *billion* on
the purchase of marijuana").

[10] *Id.,* at 5 (noting that "at least nine States . . . authorize the use of
marijuana for medicinal purposes").

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| JOSEPH FREDERICK, | ) | No. 03-35701 |
| | ) | |
| Plaintiff-Appellant, | ) | D.C. No. CV-02-8-JWS |
| | ) | District of Alaska |
| v. | ) | (Juneau) |
| | ) | |
| DEBORAH MORSE; JUNEAU SCHOOL | ) | APPELLEES' SUGGESTION OF |
| BOARD, | ) | MOOTNESS AND MOTION TO |
| | ) | DISMISS APPEAL |
| Defendants-Appellees. | ) | |

On June 25, 2007, the United States Supreme Court reversed this Court's judgment in Frederick v. Morse, 439 F.3d 1114 (9th Cir. 2006), and remanded the case for further proceedings consistent with its opinion. Morse v. Frederick, 551 U.S. _, 127 S.Ct. 2618, 2007 W.L. 1804317 (2007). On July 27, 2007, the Supreme Court entered its judgment and mandate.

Apart from the Orders awarding costs and attorney's fees to appellant Frederick ("Frederick") as the prevailing party[1] -- which must now be vacated in light of the Supreme Court's Opinion -- the only issue remaining that is not controlled by the Supreme Court's ruling is the fate of Frederick's state law claims, which were pretermitted in this Court's earlier decision. 439 F.3d at 1118, n.4.

---

[1] Order filed March 31, 2006 and April 4, 2006 (taxing costs in favor of appellants), and Order filed May 22, 2006 (awarding attorney's fees to appellant as prevailing party).

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

Frederick graduated from Juneau-Douglas High School on June 5, 2002. Declaration of Superintendent Peggy Cowan, ¶2. He has waived any claim for damages under Alaska law by failing to appeal the District Court's ruling that appellees the Juneau School Board ("the Board") and Juneau-Douglas High School Principal Deborah Morse ("Morse") are immune from any such claims under Alaska law. All references to Frederick's discipline and suspension resulting from the Bong Hits 4 Jesus incident have been expunged from his permanent school records. Declaration of Superintendent Peggy Cowan, ¶5. Accordingly, Frederick's appeal must be dismissed as moot and the case remanded to the District Court with instructions to vacate its judgment insofar as it relates to Frederick's claims for declaratory and injunctive relief under Alaska law.

Mootness is a jurisdictional issue deriving from the requirement of a case or controversy under Article III of the Constitution. Cole v. Oroville Union High School Dist., 228 F.3d 1092, 1098 (9th Cir. 2000), cert. denied 532 U.S. 905 (2001). It is not enough that a case or controversy existed when the complaint was filed.

> [A] party must maintain a live controversy through all stages of the litigation process. See DDI Giorgio v. Lee (In Re DDI Giorgio), 134 F.3d 971, 974 (9th Cir. 1998) ("to qualify for adjudication in federal court an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (citation and internal

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262    FAX (907) 586-5959
E-mail: crosbylaw@gci.net

quotation marks omitted).  If an action or a claim loses its character as a live controversy, then the action or claim becomes "moot," and we lack jurisdiction to resolve the underlying dispute.

Doe v. Madison School District No. 321, 177 F.3d 789, 797-798 (9th Cir. 1999).

This Court has repeatedly held that "once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy [allegedly in violation of constitutional guaranties]." Cole v. Oroville Union High School Dist., supra, 228 F.3d at 1098; Doe v. Madison School District No. 321, supra, 177 F.3d at 798.

Graduation does not, however, moot claims for monetary damages. Doe v. Madison School District No. 321, supra, 177 F.3d at 798, citing Ceniceros v. Board of Trustees of the San Diego Unified School District, 106 F.3d 878, 879, n.1 (9th Cir. 1997) and O'Neal v. City of Seattle, 66 F.3d 1064, 1066 (9th Cir. 1995).  And an exception to the rule that graduation moots claims for declaratory and injunctive relief is made where the complaint includes a demand to expunge references to disciplinary records that might have collateral consequences for future college admission or employment.  Flint v. Dennison, 488 F.3d 816, 824 (9th Cir. 2007) .  Neither

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

3

exception to the general rule that graduation moots claims for declaratory and injunctive relief, however, applies here.

Frederick has waived any claim for damages under state law.  The Board and Morse filed separate motions for partial summary judgment in District Court on the ground that AS 14.33.140, AS 09.65.170, and Alaska case law immunize the Board and Morse from any award of damages under the facts of this case.[2]  The District Court ruled in favor of the Board and Morse on these immunity issues.  See Order From Chambers filed May 27, 2003, R.50, 55-56.

Frederick appealed and briefed the District Court's ruling that the Board and Morse did not violate Frederick's rights under Alaska Constitution Article I, Section 5 (the Alaska "free speech" provision).  He did not, however, appeal the District Court's rulings regarding immunity from damages under Alaska statutory and case law.  Accordingly, those rulings became "law of the case," and Frederick is now deemed to have waived any claim for damages under state law by his failure to appeal these rulings.

> [A] legal decision made at one stage of litigation,
> unchallenged in a subsequent appeal when the

[2]    See Defendant's Motion for Partial Summary Judgment Re Immunity, filed December 2, 2002 (Docket No. 13) and Defendant's Motion for Partial Summary Judgment Re Immunity from Punitive Damages Under Alaska Law, filed December 3, 2002 (Docket No. 14).

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-8262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

opportunity to do so existed, becomes the law of the
case for future stages of the same litigation, and
the parties are deemed to have waived the right to
challenge that decision at a later time.

Kimberlin v. Quinlan, 199 F.3d 496, 500 (D.C.Cir. 1999), cert.

denied 536 U.S. 871 (2000); accord Beecher v. Leavenworth

State Bank, 209 F.2d 20, 22 (9th Cir. 1954) cert. denied 344

U.S. 949 (1954).  Cf. Xin Liu v. Amway Corp., 347 F.3d 1125,

1138 (9th Cir. 2003) (district court rulings not addressed in

opening briefs deemed abandoned); Collins v. City of San

Diego, 841 F.2d 337, 339 (9th Cir. 1988) ("It is well

established in this Circuit that claims that are not addressed

in the appellant's brief are deemed abandoned.")

Since Frederick has waived his right to damages under

Alaska law, his graduation from high school moots the appeal

of his right to declaratory and injunctive relief under Alaska

law, unless those claims are preserved by some other exception

to the mootness doctrine.

Frederick's complaint includes a demand for "a mandatory

injunction requiring defendants to remove all reference to

discipline based on the above incidents from his student

records."  R.5.[3]  The Juneau School District, however, has

_____

[3]    Frederick also requested that the Court issue a mandatory
injunction "to amend his grades to ameliorate any academic
disability suffered as a result of the punishments complained
of above."  R.5.  This Court has no jurisdiction, however, to
order a public school district to amend the grades of a

expunged all reference to Frederick's discipline and
suspension arising out of the banner incident.  See attached
Declaration of Superintendent Peggy Cowan and attached
educational records of Joseph B. Frederick submitted under
seal.  The absence of any reference to discipline for the
banner incident on Frederick's permanent educational records
moots his claim for declaratory and injunctive relief.

Nor can Frederick avoid dismissal by arguing that
application of the District's policy concerning display of
pro-drug messages is capable of repetition while evading
review.  Frederick has graduated and there is no possibility
that he would ever again be subjected to enforcement of the
District's policy.  Frederick did not posit a facial challenge
to the policy pursuant to which he was disciplined.  Rather,
he challenged the constitutionality of applying that policy to

---

**(footnote 3 cont'd)** student who has already graduated.  Nor
does it appear that Frederick suffered any "academic
disability," as he admitted in deposition testimony that he
was accepted at the college of his choice.  Any attempt to
remedy any supposed "academic disability," by judicially
amending Frederick's grades after the fact, would be the
sheerest speculation.  The only relief the Court could
conceivably grant would be an award of damages for injury to
Frederick's reputation.  As noted in the text, however, any
such claim for damages has been waived by Frederick.

him under the facts of the case.[4]  Even if the policy had been

challenged -- and Frederick has not done so -- this Court has

rejected any suggestion that challenges to public school

policies are "so inherently limited in duration that the

action will become moot before the completion of appellate

review."  Doe v. Madison School District No. 321, supra, 177

F.3d at 798, citing Digiorgio v. Lee (In Re Digiorgio), supra,

134 F.3d at 975 and DeFunis v. Odegaard, 416 U.S. 312, 319

(1974).

There being no applicable exception to the rule that

graduation moots claims for declaratory and injunctive relief

with respect to allegedly unconstitutional actions by public

school authorities, Frederick's remaining state law claims

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

---

[4]    Nor did Frederick seek class action status, which
arguably might have preserved a claim notwithstanding his own
graduation.  See Weinstein v. Bradford, 423 U.S. 147, 149
(1975).

7

must be dismissed and the case remanded to the District Court to vacate its judgment, insofar as it relates to Frederick's claims for declaratory and injunctive relief under Alaska law.

DATED this _31_ day of July, 2007, at Juneau, Alaska.

Respectfully submitted,

DAVID C. CROSBY, P.C.

David C. Crosby
Alaska Bar No. 7106006

Attorney for Appellees

JSD_Morse M_DismissAppeal.JSD

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262 / FAX (907) 586-5959
E-mail: crosbylaw@gci.net

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| JOSEPH FREDERICK, | ) | No. 03-35701 |
| | ) | |
| Plaintiff-Appellant, | ) | D.C. No. CV-02-8-JWS |
| | ) | District of Alaska |
| v. | ) | (Juneau) |
| | ) | |
| DEBORAH MORSE; JUNEAU SCHOOL | ) | APPELLEES' NOTICE OF |
| BOARD, | ) | FILING DOCUMENTS |
| | ) | UNDER SEAL |
| Defendants-Appellees. | ) | |

Pursuant to Circuit Rule 27-13, appellees The Juneau School Board and Deborah Morse submit the attached educational records of appellant Joseph Frederick under seal for the following reasons:

The Family Educational Rights and Privacy Act, 20 U.S.C. § 232 generally prohibits schools receiving federal funds from disclosing the educational records of students, or former students, without their or (prior to age 18 or college matriculation) their parents' consent. Regulations permit an educational agency or institution to disclose to a court relevant records necessary to defend itself against legal action brought by the student or his/her parents. 34 C.F.R. § 99.31(a)(9)(ii)(B). It is not clear whether the regulation contemplates placing educational records in an open court file. Moreover, the records necessary to provide context to this motion/suggestion of mootness include references to

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262  FAX (907) 586-5959
E-mail: crosbylaw@gci.net

disciplinary actions that arguably are not relevant to defense of appellants' claims on the merits.

Accordingly, appellees believe that the above referenced authorities require that the records be submitted under seal.

DATED this 31 day of July, 2007, at Juneau, Alaska.

Respectfully submitted,

DAVID C. CROSBY, P.C.

David C. Crosby
Alaska Bar No. 7106006

Attorney for Appellees

NoticeUnderSeal.JSD

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262  FAX (907) 586-5959
E-mail: crosbylaw@gci.net

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JOSEPH FREDERICK,

        Plaintiff-Appellant,

    v.

DEBORAH MORSE; JUNEAU SCHOOL
BOARD,

        Defendants-Appellees.

No. 03-35701

D.C. No. CV-02-8-JWS
District of Alaska
(Juneau)

DECLARATION OF PEGGY
COWAN

    PEGGY COWAN, under penalty of perjury, declares as
follows:

    1.    I am the Superintendent of the Juneau (Alaska)
School District ("the District"), and I make this declaration
in support of the motion of Defendants-Appellees the Juneau
School Board and Deborah Morse to Dismiss Appeal.

    2.    Joseph Frederick attended Juneau-Douglas High School
from August 28, 2000 until June 5, 2002, at which time he
graduated.

    3.    I examined the educational records of Joseph
Frederick on file with the District as of July 26, 2007.
These records consisted of his transcript, which makes no
reference to his disciplinary record; his cumulative file,
which contains grades, test scores and some miscellaneous

-1-

records, but does not contain any disciplinary records or
disciplinary information; and the following:

      a.   Summary of disciplinary action (one page),
from the district's electronic database known
as "SASI," which makes reference to a Multiple
Category II infraction resulting in suspension
on January 24, 2002 (the "Bong Hits 4 Jesus"
incident). Attachment 1 (under seal).

      b.   Individual disciplinary records maintained
on the district's electronic database
"SASI."(seven pages). Page 5 of 7 is the
incident report for the "Bong Hits 4 Jesus"
banner incident occurring on January 24, 2002,
noting that Mr. Frederick received a ten-day
suspension for Multiple Category II offenses.
Attachment 2 (under seal).

   4.   Federal law and the District's regulations generally
prohibit the release of a student's records without the
student's written consent. District regulations permit the
disclosure of records to a requesting post-secondary
institution in which a student or former student seeks to
enroll without the student's consent, but typically those
institutions request only a student's transcript. To the best
of my understanding and knowledge, the District has not

2

received a request for, nor has it released, a student's disciplinary records to a post-secondary institution in at least the last seven years, which is the period of time that the district employee in charge of responding to student record requests has filled that position.

5.    In the exercise of my discretion, on July 30, 2007 I directed that all references in the District's database to the discipline arising out of the "Bong Hits 4 Jesus" banner incident on January 24, 2002 be expunged.

6.    I have verified that this information no longer exists in the District's computer system, and have directed that all printouts of the same be shredded.

7.    Attachments 1A and 2A (under seal) are the disciplinary records of Joseph B. Frederick as they now exist after all references to discipline arising out of the incident on January 24, 2002, were removed.  It is no longer possible for anyone to obtain information concerning that incident or the discipline of Frederick with respect to the same through accessing his educational records on file with the District.

DATED this ____ day of _____, 2007.

_____
Peggy Cowan, Superintendent
Juneau School District

3

**ATTACHMENT 1**

**TO DECLARATION OF PEGGY COWAN**

**JOSEPH FREDERICK  DISCIPLINARY RECORDS AS THEY EXISTED PRIOR
TO EXPUNGING REFERENCES TO BONG HITS 4 JESUS DISCIPLINE**

**HAS BEEN SUBMITTED UNDER SEAL**

Nb: Paragraphs 3(a) and (b) of Ms Cowan's declaration incorrectly reference these
documents as Attachments 1 and 2.  All pre-expungement records are included in a single
attachment (Attachment 1).

**ATTACHMENT 2**

**TO DECLARATION OF PEGGY COWAN**

**JOSEPH FREDERICK  DISCIPLINARY RECORDS AS THEY EXIST AFTER
EXPUNGING REFERENCES TO BONG HITS 4 JESUS DISCIPLINE**

**HAS BEEN SUBMITTED UNDER SEAL**

Nb: Paragraphs 7 of Ms Cowan's declaration incorrectly references these documents as
Attachments 1A and 2A.  All post-expungement records are included in a single
attachment (Attachment 2).

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOSEPH FREDERICK,
*Plaintiff-Appellant,*

v.

DEBORAH MORSE; JUNEAU SCHOOL
BOARD,
*Defendants-Appellees.*

No. 03-35701

D.C. No.
CV-02-00008-J-JWS
District of Alaska,
Juneau

ORDER

On Remand from the
United States Supreme Court

Filed August 23, 2007

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld, and
Kim McLane Wardlaw, Circuit Judges.

---

**ORDER**

Pursuant to the mandate of the Supreme Court, our judgment is vacated and the case is remanded to the District Court of Alaska for further consideration in light of *Morse v. Frederick*, 551 U.S. ___, 127 S. Ct. 2618, 168 L.Ed.2d 290 (2007).

IT IS SO ORDERED.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2007 Thomson/West.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Law Office of Douglas K. Mertz**
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JOSEPH FREDERICK,                    )
                                     )    Court of Appeals No. 03-35701
　　　　Appellant,                    )    District Court No. J02 008 CV (JWS)
                                     )
　vs.                                )
                                     )
DEBORAH MORSE and the                )
JUNEAU SCHOOL BOARD,                 )
                                     )
　　　　Appellees.                    )
_____    )

**APPELLANT'S OBJECTION TO SUGGESTION OF MOOTNESS AND MOTION FOR
FURTHER PROCEEDINGS AND TO CERTIFY STATE LAW QUESTIONS**

　　　　Joseph Frederick moves this court to a) take up or certify the state law issues on

which it withheld action in the original appeal decision in this case; and b) remand the federal

issues for a trial on the issue of whether Mr. Frederick had a plausible social or political purpose

behind his speech.   The School Board's suggestion that the entire case be dismissed as moot is

flat wrong, as the primary issues  in this case remain to be adjudicated after the Supreme Court

decision.

**1.  BOTH STATE AND FEDERAL ISSUES REMAIN TO BE DECIDED.**

　　**a) State issues**: Mr. Frederick's complaint asserted that his banner display was protected

under both the federal and state constitutions.  The District Court ruled against the state claim.

1

1

2

3    Mr. Frederick appealed that decision, as well as the federal issues.[1]  This court declined to

4    address the state issue since it disposed of the case on the basis of the federal issues.  Now, after

5    the Supreme Court has reversed on the federal issues, the state issue is once again before this

6    court for decision.  It may be that this issue is appropriate to certify to the Alaska Supreme Court

7    for a definitive ruling on application of state law.

8         **b) Federal issues:** The School District claims that no federal  issues remain alive.  In

9    fact, the opinions of the justices of the Supreme Court show a clear majority found that a student

10   punished by a public school for his speech may assert that the speech has a political or social

11   purpose, even when a school official believes it is a pro-drug statement.

12        A five-to-four majority voted to reverse the Court of Appeals judgment that had decided

13   the case for Mr. Frederick.  However, there was no majority in favor of any one theory for the

14   reversal.  Of the five who voted to reverse, four did so on the theory that schools can take

15   "reasonable steps" to protect students from "speech encouraging illegal drug use." (Chief Justice

16   Roberts and Justices Scalia, Kennedy, and Alito [bench opinion of the Chief Justice at 8]).  The

17   fifth, Justice Thomas, took the position that students do not have protections under the Bill of

18   Rights at all [bench opinion of J. Thomas at 10-12].  And of the four who adopted the narrow

19   exception to free speech protections for pro-drug speech, two, Justices Alito and Kennedy,

20   explicitly conditioned their concurrence on the belief that

21

22

23

24

25

26   _____

27   [1]   The state issue was briefed at pp. 35-37 of the appellant's brief and pp.33-40 of the
      appellees' brief.

28                                              2

**Law Office of Douglas K. Mertz**
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

1

2

3          > The majority decision offers no support for restricting speech that
4          > can plausibly be interpreted as commenting on any political or
           > social issue, including legalizing marijuana.[2]

5

6  [Bench opinion of J. Alito, joined by J. Kennedy, at 1.] Thus Justices Kennedy and Alito joined

7  with the dissenting justices, Justices Stevens, Souter, and Ginsburg, in the opinion that political

8  or social comments renders student speech protected by the First Amendment.    A majority thus

9  clearly believes that comment on a political or social issue comes under the *Tinker* standard, i.e.,

10 it is protected unless the school can demonstrate a substantial and imminent disruption of the

11 educational process, which even the School District admits did not occur here.

12          The only finding in this case on whether Mr. Frederick's words were a comment

13 on a social or political issue is that of the District Court, which found that Mr. Frederick did have

14 an actual intent to communicate with the banner, citing his affidavit statements that it was

15

16 intended as a humorous parody and an exhibition that he had free speech rights. [ER 57, text and

17 fn. 27.] Mr. Frederick testified that the banner display was intended as a protest to the high

18 school administration's disregard of student rights and as an assertion that, as an American, he

19 did still have rights under the Constitution. [ER 35, p. 1; deposition (ER 16) at 4, 13-14, 33, 56-.

20 59]. The District Court's finding of a serious communicative purpose may be dispositive on this

21 point, but if not, at the very least, a trial is required to determine the key factual issue of whether

22

23 the display was a plausible comment on a political or social issue.

24 _____

   [2]

25          Justices Kennedy and Alito also pointed out that the Court ringingly reaffirmed the
   Tinker standard for deciding student speech cases [J. Alito bench opinion, p. 1], a point that
26 every member of the Court except Justice Thomas agreed with. The Court overwhelmingly
   rejected the School District's claim that it could punish any speech "inconsistent with the
27 school's educational mission."

28
                                              3

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

There is also the issue of whether the high school principal doubled Mr. Frederick's punishment because he quoted Thomas Jefferson on free speech to her after she seized the banner.  The District Court explicitly declined to grant summary judgment to either side on this issue [ER 61-62, text and fn. 50]. It cannot seriously be contended that debating an issue of free speech, and invoking the name of the author of the Declaration of Independence, is not a serious comment on a social or political issue.  The only issue is whether she did punish him for quoting Jefferson, a matter on which she first claimed no memory and later denied.  This is a separate factual issue from the banner's message itself and deserves a separate finding.

Thus the federal issues require a further adjudication, consistent with the Supreme Court decision.

## 2. THE SCHOOL DISTRICT'S CLAIM OF MOOTNESS IS FLAT WRONG

At this late stage in the litigation, the Juneau School District has adopted the tactic of purging its records of mention of the discipline against Joseph Frederick over the banner incident as a way to bootstrap itself to a claim of that all issues are moot.   This tactic will not work, for several reasons.

a) *It is settled law that a defendant in an injunction action may not render the case moot by voluntary cessation of the actions sought to be enjoined.*  As the Supreme Court ruled in United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 303 (1953),

> ...Voluntary cessation of illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot...A controversy may remain to be settle in such circumstances...e.g., a dispute over the legality of the challenged practices...The defendant is free to return to his old ways.

4

The *W.T. Grant* Court also stated that the case may be moot if the defendant "can demonstrate that there is no reasonable expectation that the wrong will be repeated," that the burden is a heavy one on the defendant,[3] and that the purpose of an injunction is to prevent future violations. More recently the Court reaffirmed this holding in Buckhannon Board v. West Virginia, 532 U.S. 598, 121 S.Ct. 1835, 1842-3 (2001):

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless it is " absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation marks and citations omitted).

Accord, Qwest Corporation v. City of Surprise, 434 F.3d 1176 (9th Cir. 2006), Lindquist v. Idaho State Bd. of Corrections, 776 F.2d 851, 854 (9th Cir. 1985).[4]

Unless the School Board can certify that it has abandoned the practice complained of here and will not resume it, there remains a live dispute over legality and injunctive relief, so the case cannot be considered moot.[5]

---

[3] Citing United States v. Aluminum Com. Of America, 148 F.2d 416, 448 (1945).

[4] See Native Village of Noatak v. Blatchford, 38 F.3d 1505 (1994), holding that there are exceptions to the mootness doctrine where the defendant's conduct constitutes a wrong "capable of repetition yet evading review," or where the defendant voluntarily ceases an allegedly illegal practice but is free to resume it at any time, citing *W.T. Grant* and *Lindquist, op.cit*.

[5] However, if the School District is taking the position that it will no longer punish students for exercises of speech of the sort in this case, we would consider a stipulation to a court-ordered dismissal.

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

*b) The School District ignores the fact that the complaint asks for declaratory relief.*  The District's mootness argument rests on the claim that injunctive relief and monetary damages are not available.  While we believe both assertions are wrong, the District ignores the fact that Mr. Frederick also asked for declaratory relief, i.e., for a ruling that the District's actions violate the federal and state constitutions.   As the cases cited above – *Buckhannon, Friends of the Earth,* and *W.T. Grant* – establish, declaratory relief is an independent basis for retaining court jurisdiction over a live dispute, whether or not other forms of relief are available.  The plaintiff has a right to have the federal courts declare whether or not the actions of the District violated his legal rights, even if there is no subsequent relief through an injunction or a damage award.  Unless the District now concedes the illegality of its actions, the dispute is alive and declaratory relief is available.

Moreover, the District's argument assumes that relief is available only if it can be applied to Mr. Frederick, who has graduated.  The complaint clearly asks for injunctive relief as to similar actions against all persons "similarly situate." [ER 5]  In other words, he has asked for declaratory relief, and where applicable, injunctive relief, that would apply to the defendants and future students.  This relief is not only reasonable but necessary if this dispute is not to evade review.  By the District's logic, it can violate the rights of seniors and then move to dismiss the case as moot after the seniors graduate, and do the same thing, year after year, while never receiving an actual adjudication of the dispute.  This court can always adjudicate disputes that will evade review if mootness is applied in a mechanical manner.

6

*Law Office of Douglas K. Mertz*
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

1

2

3          *c) There are other damages than through maintenance of school records.*

4    Mr. Frederick suffered damages other than through the records and has a right to damages as a

5    result.  Following the banner incident, Mr. Frederick suffered a campaign of retaliation and

6    harassment by School District officials, including false reports to the police, a false arrest

7    instigated by the high school, and slander about him directed toward his fellow students.  Mr.

8    Frederick has the right to prove these damages against the District..  These are live claims which

9    Mr. Frederick has the right to pursue.

10

11          *d)  Finally, the District is flat wrong that damages are no longer available*

12   *here.*  While the principal may be immune from damages under 42 U.S.C. Sec. 1983 due to

13   qualified immunity – a point on which the Supreme Court was clear – that does not mean that

14   damages are not available at all.  It is undeniably the law that municipal entities, which the

15   school board is, are liable for damages even when its officials have qualified personal

16   immunity.[6]

17

18          The School Board claims that Mr. Frederick somehow waived his claim

19   for damages because it failed to brief, on appeal, the issue of whether Alaska Statute 14.33.140

20   and Alaska Statute 09.65.170 give the Board immunity from damages.   The District Court ruled

21   that AS 14.33.140 gave immunity to the high school principal and the board, but explicity

22   declined to rule on applicability of AS 09.65.170.[7]  As to AS 14.33.140, it applies on its face to

23   teachers, teacher's assistants, a principal, or "another person," not to governmental entities.

24   Thus when the District Court ruled that it applied to the School Board he could only have been

25

26   ⁶ Monell v. Dep't of Social Services, 436 U.S. 658 (1978); Palmerin v. City of Riverside, 794
        F.2d 1409, 1415 (9ᵗʰ Cir. 1986).
27   ⁷ Footnote 24 of the District Court decision, at ER 56.

28                                                7

referring to the individual persons on the board, not to the Board as an entity of government itself. Moreover, this state statute could not even purport to immunize persons against liability imposed by federal law, which is clearly beyond the power of a state statute. Finally, and most important, the District Court ruled that there was no constitutional violation in the first place, therefore its remarks regarding immunity of particular persons were *obiter dicta*, unnecessary to its judgment, and probably could not even have been appealed in the first place. The entire point of the appeal was to challenge the District Court's conclusion that Mr. Frederick's constitutional rights were not violated; the other issues such as immunity and damages would only come into play once that decision was reversed. In short, there was never any intention to waive the remedy of damages, which has always been, and remains, a key claim in this case.

## CONCLUSIONS

The School Board's motion has the inventiveness and audacity to try to sweep away both the federal issues and state issues that still remain very much alive and in dispute. A fair reading of the Supreme Court decision shows a clear majority would allow a student to prove that his speech was comment on a social or political issue; Mr. Frederick's affidavits show he did have such an intent, so he has a right to an adjudication on that point, after trial if necessary. As to state law, this court has never ruled on those claims, as to which there is no credible argument that Mr. Frederick ever had an intent to waive his argument on immunity. The appropriate course as to the state issues is either for this court to rule on the basis of the arguments in the briefs, or on supplemental briefing; or, as we suggest, by certifying the free speech issues under state law to the Alaska Supreme Court.

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

8

Dated: *August 30, 2007*

Douglas K. Mertz
Attorney for Joseph Frederick, Appellant

### Certificate of Service

I hereby certify that on this date I served a copy of the above pleading on the following by placing a copy of it in the U.S. mail, postage prepaid, to:

David Crosby, 5280 Thane Road, Juneau, Alaska 99801-7717.

Date: *8/30/07*

**Law Office of Douglas K. Mertz**
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

9

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| JOSEPH FREDERICK, | ) | No. 03-35701 |
| | ) | |
| Plaintiff-Appellant, | ) | D.C. No. CV-02-8-JWS |
| | ) | District of Alaska |
| v. | ) | (Juneau) |
| | ) | |
| DEBORAH MORSE, JUNEAU | ) | APPELLEES' OPPOSITION |
| SCHOOL BOARD, | ) | TO MOTION FOR FURTHER |
| | ) | PROCEEDINGS AND TO |
| Defendants-Appellees. | ) | CERTIFY STATE LAW |
| | ) | QUESTIONS |

Appellant Joseph Frederick ("Frederick") asks this Court to take up the state law constitutional questions pretermitted in this Court's Opinion of March 10, 2006, Frederick v. Morse, 439 F.3d 1114 (9th Cir. 2006) rev'd _ U.S. _, 127 S.Ct. 2618 (2007), or, in the alternative to certify those questions to the Alaska Supreme Court. For the reasons stated in the pending motion filed by appellees The Juneau School Board and Deborah Morse ("the Board"), the dispute between the parties has been mooted by the action of the Superintendent of the Juneau School District expunging any reference to Mr. Frederick's discipline in connection with the "Bong Hits 4 Jesus" incident.[1]  Nor should this Court certify a moot question to the Alaska Supreme Court, for that would

---

[1]    Mr. Frederick did not submit any additional argument with respect to his Alaska law claims. The issue is addressed in the Brief of Appellees Deborah Morse and Juneau School Board at 35-40.

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262    FAX (907) 586-5959
E-mail: crosbylaw@gci.net

involve retaining jurisdiction over a matter that has lost its character as a live case or controversy.[2]

DATED this 6 day of September, 2007, at Juneau, Alaska.

Respectfully submitted,

David C. Crosby
Alaska Bar No. 7106006

Attorney for Appellees

The undersigned certifies that on September 6, 2007, one copy of the foregoing was hand delivered to the office of: Douglas Mertz, 319 Seward St., Suite 5, Juneau, AK 99801.

Secretary to Mr. Crosby

Final —
OpposFurtherProc_StateLawQuestions.JSD

David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
(907) 586-6262   FAX (907) 586-5959
E-mail: crosbylaw@gci.net

---

[2]    Certification refers a question to the state's highest court, which, once answered returns the case to this Court for final disposition.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

No. 03-35701

---

JOSEPH FREDERICK,

Appellant,

vs.

DEBORAH MORSE and the JUNEAU SCHOOL BOARD,

Appellees.

---

On Appeal from the United States District Court
For the District of Alaska

---

REPLY BRIEF OF APPELLEES DEBORAH MORSE AND
JUNEAU SCHOOL BOARD RE SUGGESTION OF MOOTNESS
AND MOTION TO DISMISS APPEAL

---

David C. Crosby
David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
Tel: (907) 586-6262
Fax: (907) 586-5959
E-mail: crosbylaw@gci.net

Attorney for Appellees

Appellant Frederick ("Mr. Frederick") posits a grab bag of arguments in an effort to avoid the conclusion of mootness and to tempt this court into rendering an advisory opinion on what would be a matter of first impression under Alaska constitutional law. Some of the arguments – such as the assertion that there was no Supreme Court majority opinion – are nothing more than wishful thinking. Many of the arguments proceed as though Mr. Frederick had pled a facial challenge to a Board policy, simply ignoring the fact this is an "as-applied" challenge. None of his arguments address (or, indeed, even mention) this Court's decisions cited in the Board's opening brief squarely holding that graduation moots claims for declaratory and injunctive relief against allegedly unconstitutional school policies or actions. The burden was on Mr. Frederick to bring himself within some acknowledged exception to this oft-repeated rule. He has failed to do so.

## I.    THE SUPREME COURT'S DECISION CONCLUSIVELY DISPOSES OF ALL FEDERAL CLAIMS

Frederick makes the baffling assertion that the Supreme Court's remand "for further proceedings consistent with [its] opinion" entitles him to relitigate whether his banner was a pro-drug message. Appellant's Objection to Suggestion of Mootness and Motion for Further Proceedings and to Certify State Law Questions at 2-3, 8 (hereinafter, "Opposition").

1

The argument proceeds from a flat misreading of the Supreme Court's

Opinion – which Frederick contends included "no majority in favor of any

one theory for reversal." Id. at 5.

Four Justices (Scalia, Kennedy, Thomas, and Alito) joined in the

Opinion of the Court by Chief Justice Roberts. Morse v. Frederick, 551 U.S.

__, 127 S.Ct. 2618, 2621 (2007). Justice Thomas prefaced his concurring

opinion with the words:

> The Court today decides that a public school may
> prohibit speech advocating illegal drug use. I agree
> and therefore join its opinion in full.

127 S.Ct. at 2629-30 (Thomas, J., concurring) (emphasis added).

Frederick's suggestion that the majority entertained doubts as to the

meaning of his banner, or that their decision was conditioned upon a further

finding by a lower court that the banner was in fact intended to advocate

drug use, is even more puzzling. Chief Justice Roberts flatly stated:

> Stripped of rhetorical flourishes, then, the debate
> between the dissent and this opinion is less about
> constitutional first principles than about whether
> Frederick's banner constitutes promotion of illegal
> drug use. We have explained our view that it does.

127 S.Ct. at 2629 (emphasis added).[1]

---

[1]    See also 127 S.Ct. at 2624-25 ("We agree with Morse['s reasonable
construction of the banner as advocating or celebrating illegal drug use].")
The majority's conclusion was based in part on Frederick's repeated refusals

Frederick is not entitled to a trial on the issue of whether Principal

Morse allegedly increased his suspension for quoting Thomas Jefferson,

either. Frederick incorrectly states that Chief District Judge Sedwick

declined to rule on whether Principal Morse doubled his punishment for

allegedly quoting Thomas Jefferson. Opposition at 4. Judge Sedwick ruled

that Frederick's assertion to this effect was an after-the-fact fabrication

incapable of creating an issue of fact – in effect, was inadmissible – because

it flatly contradicted his prior testimony given during his appeal hearing

before the School Board. ER 61-62. Frederick failed to assign error to this

ruling in the briefs filed in support of his appeal, and Judge Sedwick's ruling

is now law of the case precluding any further litigation of the issue.

## II.    FREDERICK'S STATE LAW CLAIMS ARE MOOT

In their opening brief, the Board and Morse (hereinafter referred to

collectively as "the Board") cited this Court's recent, controlling authority

squarely holding that graduation from high school moots claims for

declaratory and injunctive relief against a school policy or action allegedly

in violation of the former student's constitutional rights. Frederick makes

no attempt to distinguish, or even to acknowledge the existence of, these

cases. Frederick makes six arguments, none of which has the least merit.

---

under oath to ascribe any other meaning – political, social or otherwise – to
his banner. 127 S.Ct. at 2625.

3

### A.    The Voluntary Cessation Exception Does Not Apply

The Board and Morse have not "ceased" anything. The

Superintendent of the School District – who is not a party to this litigation –

exercised her discretion to remove any references to Frederick's discipline

for the Bong Hits incident from his permanent records and to destroy any

hard copies in the school district's files.   Since this is the only relief that the

Court could conceivably award to Frederick, his case is moot.

Frederick contends that there will be a live dispute unless and until

"the Board can certify that it has abandoned the practice complained of

here." Opposition at 5.  But Frederick never complained of any "practice."

The complaint does not seek to invalidate or enjoin any Board policy.[2] This

is an "as-applied" case.  Frederick v. Morse, 439 F.3d 1114, 1118 (9th Cir.

2006)  The voluntary cessation exception to mootness doctrine does not

apply where the defendant continues to enforce the policy that gave rise to

---

[2]    In view of the Supreme Court's decision, there is little question that the
school board policy at issue would survive a facial challenge – if such a
challenge had been brought.  Even Justice Stevens' dissent (joined by
Justices Souter and Ginsburg) recognized that the school board policy at
issue was a permissible rule:  "I am willing to assume that the Court is
correct that the pressing need to deter drug use supports JDHS's rule
prohibiting willful conduct that expressly 'advocates the use of substances
that are illegal to minors.'"  Morse, 127 S. Ct. at 2643-44 (Stevens, J.,
dissenting) (quoting Juneau Sch. Bd. Policy No. 5520).

4

the plaintiff's claim.  Doe v. Madison School District No. 321, 177 F.3d 789, 799 (9th Cir. 1999).

Moreover, even if the voluntary cessation exception were in play here, the exception does not apply when "there is no reasonable expectation that the wrong will be repeated."  Id. at 5, quoting W.T.Grant Co., 345 U.S. 629, 633 (1953).  That is the point of this Court's decisions holding that graduation moots student claims for declaratory and injunctive relief against allegedly unconstitutional policies and actions – once the student graduates he or she can never again be punished for disobeying an allegedly unconstitutional policy, or a policy that has been applied in an allegedly unconstitutional fashion. [3]

**B.    Graduation Moots Claims for Declaratory Relief**

Frederick next asserts that even though expungement of his records moots his request for an injunction, he is still entitled to a declaration of his rights.  Opposition at 6.  The cases cited in the Board's opening brief,

---

[3]    Frederick's complaint can not be that the Board might enforce its policies in the future – he never challenged Board policies, only their application to him – but that the Superintendent might change her mind and reverse his permanent records to make reference to the Bong Hits incident. There is no reason to question the truthfulness of  Superintendent Cowan's sworn declaration that it is no longer possible to access information about Frederick's discipline for the incident through his educational or disciplinary records maintained by the School District.

however, clearly hold that graduation moots claims for injunctive <u>and</u> declaratory relief.

<u>Ashcroft v. Mattis</u>, 431 U.S. 171, 173 (1977) is instructive. There the plaintiff brought a 1983 action against a police officer for damages and declaratory relief arising out of the shooting of the plaintiff's son. The trial court ruled that the officer was shielded from damages by a defense of good faith and dismissed the complaint. The plaintiff appealed the denial of declaratory relief, but not the ruling immunizing the officer from damages. The Eighth Circuit Court of Appeals reversed, holding that declaratory relief was available to challenge the constitutionality of the state's deadly force statute. The plaintiff then filed an amended complaint for declaratory relief. The district court upheld the statute in question, but the Eighth Circuit reversed. The United States Supreme Court reversed the Eighth Circuit, holding that once the issue of the officer's liability had been removed from the case, the request for declaratory relief became moot. <u>See also Horizon Bank & Trust Co. v. Massachusetts</u>, 391 F.3d 48, 53 (1st Cir. 2004) ("An appeal can also become moot because of a party's own choices about which issues to appeal."); <u>Haislah v. Walton</u>, 748 F.2d 359, 360-61 (6th Cir. 1984) (failure to appeal self-defense verdict immunizing the defendant from damages in 1983 case rendered appeal on declaratory judgment claim moot).

6

### C.    Frederick Can Not Assert the Rights of Other Students

Frederick next argues that he requested an injunction for all "similarly situated" students, including those who have not yet graduated.  In an "as-applied" challenge there are no others "similarly situated."  The case is about the constitutionality of applying school policies – not themselves alleged to be unconstitutional – to Frederick under the unique circumstances alleged in his complaint.

The prudential standing rule against raising the constitutional rights of others may be relaxed in First Amendment <u>facial</u> challenges to statutes on overbreadth grounds, but that is not the gravamen of Frederick's complaint here.  And even in the facial challenge context, once the dispute as to the plaintiff loses its character as a live case or controversy the case must be dismissed, notwithstanding the alleged continuing impact of the statute on the rights of others.  <u>Virginia v. American Booksellers Ass'n</u>, 484 U.S. 383, 392 (1988);  <u>Service Employees International Union v. Municipality of Mt. Lebanon</u>, 446 F.3d 419, 423 (3d Cir. 2006).

### D.    "Capable of Repetition While Evading Review" Does Not Apply

Frederick contends that unless he is permitted to maintain his challenge, disputes involving seniors will inevitably be dismissed as moot. The same argument was rejected in <u>Doe v. Madison School District No. 321</u>,

7

supra, 177 F.3d at 798.  See also Weinstein v. Bradford, 423 U.S. 147, 148
(1975) (must be capable of repetition to the complaining party).

### E.    Frederick Has Not Alleged Harassment or Retaliation

Frederick next asserts that even though the potential for future injury
has been removed by the Superintendent's action in expunging his
disciplinary record, he is entitled to litigate supposed damage claims for
retaliation and harassment.  The Court, however, will search Mr. Frederick's
complaint in vain for reference to any such claims.  To the extent that the
supposed damages allegedly arise out of the facts alleged in the complaint,
they have been waived or abandoned by failure to appeal Judge Sedwick's
immunity ruling.

### F.    Judge Sedwick's Immunity Order Is Law of the Case

Judge Sedwick squarely held that AS 14.33.140 immunizes both the
Juneau School Board and Principal Morse from damage claims based on
enforcement of the school's discipline policy.  ER 55-56.  Frederick asserts
that he was not required to appeal this ruling – even though he thought it
necessary to appeal the parallel ruling granting immunity to Morse under
federal law – because it was mere "obiter dicta."  Opposition at 8. [4]

---

[4]    Frederick argues that the reference in AS 14.33.140 to "[a] teacher,
teacher's assistant, a principal, or another person responsible for students"
applies only to individuals, not the Board as an entity.  This argument was

8

Judge Sedwick's Alaska law immunity rulings were made after extensive briefing in response to separate motions filed by the Board before Frederick filed his summary judgment motion. Doc.Nos. 13, 14. The rulings were the subject of Orders entered in advance of Judge Sedwick's ruling on the cross-motions for summary judgment. ER 63. They provided a fully litigated, alternative basis for dismissing state law damage claims against the Board in the event the district court were reversed on the constitutional question. Such alternatively stated grounds for a judgment are common and help to expedite the flow of litigation. See Guadalupe-Cruz v. Immigration and Naturalization Service, 240 F.3d 1209, 1211 n.5 (9th Cir. 2001) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dicta.")  See also Gausvik v. Perez, 392 F.3d 1006, 10089 (9th Cir. 2004) (alternative holdings on liability and immunity in 1983 action).  See also discussion in Section III(B), supra, of Ashcroft v. Mattis, 431 U.S. 171 (1977) and related cases dismissing declaratory judgment claims as moot where the plaintiff failed in a 1983 action to appeal rulings shielding the defendant from liability for damages.

---

not made below  (see Doc. No. 16 at 19-20) or in Frederick's opening brief on appeal and cannot be made for the first time here. The argument is wrong, in any event. Alaska law defines "person" in very broad terms (see AS 01.10.060(8)), and Judge Sedwick properly concluded that the statute applied to the Board as "another person responsible for students."

If Frederick wished to preserve his damage claim under Alaska law, he was obligated to challenge Judge Sedwick's immunity rulings in his briefs on appeal – just as he did with respect to Judge Sedwick's federal immunity ruling.

## III.    CONCLUSION

This Court has neither the need nor the power to render an advisory opinion on a sensitive matter of first impression under Alaska constitutional law.  This Court should vacate the district court's judgment insofar as it relates to Frederick's claims for declaratory and injunctive relief pursuant to Article I, Section 5 of the Alaska Constitution and remand the case to the district court with instructions to dismiss.[5]

DATED this 7 day of September, 2007, at Juneau, Alaska.

DAVID C. CROSBY, P.C.

David C. Crosby
Alaska Bar No. 7106006

Attorney for Appellees

---

[5]    In the conclusion of its opening brief, the Board suggested that the Court should dismiss the appeal and remand with instructions to vacate so much of the judgment as related to Frederick's right to declaratory and injunctive relief under Alaska law.  While it is perhaps a distinction without a difference, the Board now believes that the appropriate form of order is one by this court vacating and remanding the case with instructions to dismiss.  See 1 P.Ulrich, et al., FEDERAL APPELLATE PRACTICE: NINTH CIRCUIT § 3.3, at page 78-79 (2d ed. 1999).

10

CERTIFICATE OF SERVICE

The undersigned certifies that on September ___, 2007, one copy of:

REPLY BRIEF OF APPELLEES DEBORAH MORSE AND
JUNEAU SCHOOL BOARD RE SUGGESTION OF
MOOTNESS AND MOTION TO DISMISS APPEAL

was served by  e-mail and first class mail, postage prepaid, on

Douglas K. Mertz
319 Seward Street
Suite 5
Juneau, AK 99801

David C. Crosby

Service.JSD

1

2

3

4 IN THE UNITED STATES COURT OF APPEALS

5 FOR THE NINTH CIRCUIT

6

7 JOSEPH FREDERICK,                    )
                                       )    **Court of Appeals No. 03-35701**
8           Appellant,                 )    District Court No. J02 008 CV
                                       )
9      vs.                             )
                                       )
10                                     )
11 DEBORAH MORSE and the               )
   JUNEAU SCHOOL BOARD,                )
12                                     )
13          Appellees.                 )
   _____ )
14

15
   **APPELLANT'S REPLY TO OPPOSITION TO MOTION FOR FURTHER**
16 **PROCEEDINGS AND TO CERTIFY STATE LAW QUESTIONS**

17           The Appellees oppose Mr. Frederick's motion for further proceedings as to the

18 applicability of the Alaska Constitution on the theory that there is no "live controversy."  In fact,

19 its own pleadings admit that there is very much a controversy that requires further adjudication.

20

21

22           The School Board repeats its earlier assertion that voluntary removal of computer

23 records of the discipline imposed on Mr. Frederick removes all controversies.  This is as far from

24 accurate as could be.   The Board's own recent pleading states that it will continue the policy of

25 disciplining students under the same circumstances, i.e., when a student uses speech that a school

26

27                                              1

28

**Law Office of Douglas K. Mertz**
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

administrator believes could be taken as promoting an illegal drug, even when the student avers a completely different and unrelated intention to the speech.   Thus the Board will continue the very conduct that is at the heart of Mr. Frederick's complaint.   It would be fatuous for it to claim that there is no controversy between the two sides on an issue of constitutional dimensions.

The U.S. Supreme Court dealt with this situation – the suggestion of mootness in a First Amendment case – in Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392-393 ((1988) – in which it said,

> in the First Amendment context, "'[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" Secretary of State of Maryland v. J. H. Munson Co., 467 U.S. 947, 956-957 (1984), quoting Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

[484 U.S. 392-393.] Thus it does not matter that some pertinent records are gone or that Mr. Frederick has graduated: The controversy is very much alive and Mr. Frederick, as a victim of overreaching punishment of his free speech, has clear standing to assert the illegality of the school's conduct because the school admits it will continue the conduct, and that conduct will obviously chill the rights of similarly situated students to free speech under similar circumstances.[1]

---

[1] This fact removes this controversy from case law such as Ashcroft v. Mattis, 431 U.S. 171 (1977), in which the only issue was personal liability of an individual officer.  This case, in contrast, has always been about the legality of the school district's conduct under the Constitution; issues of personal liability are decidedly secondary.

2

1

2

3

4          This court reached the same conclusion where voluntary cessation of the

5    offending conduct leaves the main issue unresolved for the future.  Under the voluntary cessation

6    exception to mootness doctrine, a "defendant's voluntary cessation of a challenged practice does

7    not deprive a federal court of its power to determine the legality of the practice." City of

8    Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982), following Ne. Fla. Chapter of

9    Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, at 661-62 (1993) . If it

10   were otherwise, "the defendant's mere voluntary cessation would compel the courts to leave the

11   defendant free to return to his old ways." Smith v. Univ. of Wash. Law Sch., 233 F.3d 1188,

12   1194 (9th Cir. 2000), following City of Mesquite, 455 U.S. at 289 n.10.

13

14

15

16          The School District's theory seems to be that it can avoid having an adjudication

17   of the live issue of the legality of its conduct by simply removing the evidence of that conduct

18   from one student's records.  But as long as the District maintains that it will continue the

19   offensive conduct, the legal controversy remains very much alive, and under *American*

20   *Booksellers, op. cit.*, the case is not moot and should be adjudicated.

21

22

23

24          Finally, as to the remaining issues of state law, the *American Booksellers* case

25   controls as well: The Supreme Court's remedy in that case was to remand the case to the Virginia

26   Supreme Court for an authoritative construction of state law, 484 U.S. at 398.  We respectfully

27                                                    3

28

*(left margin)* Law Office of Douglas K. Mertz
319 Seward Street, Suite 5, Juneau, Alaska 99801
(907) 586-4004, 586-4141 [fax], dkmertz@ak.net

September 11, 2007

Douglas K. Mertz

Attorney for Joseph Frederick, Appellant

**Certificate of Service**

I hereby certify that on this date I served a copy of the above pleading on the following by placing a copy of it in the U.S. mail, postage prepaid, to:

David Crosby, 5280 Thane Road, Juneau, Alaska 99801-7717.

Date:    9/11/07

4

**FILED**

UNITED STATES COURT OF APPEALS

SEP 1 0 2007

FOR THE NINTH CIRCUIT

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| JOSEPH FREDERICK, | No. 03-35701 |
|---|---|
| Plaintiff - Appellant, | D.C. No. CV-02-00008-J-JWS |
| v. | District of Alaska, |
| | Juneau |
| DEBORAH MORSE; et al., | |
| Defendants - Appellees. | ORDER |

Before: HALL, KLEINFELD, and WARDLAW, Circuit Judges.

This case has been remanded to the District Court of Alaska. Therefore, appellees' suggestion of mootness and motion to dismiss filed on August 2, 2007, along with appellant's objection to said suggestion and motion filed on August 31, 2007, are referred to the District Court for consideration.